James T. DRUM and Linda I. Drum,
his wife, Appellants,

v.

SHAULL EQUIPMENT AND SUPPLY
COMPANY and Larry Brown and
Marlin Pentz, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 1, 2000.
Filed Dec. 7, 2001.

Thomas R. Kline, Philadelphia, for appellants.

Timothy D. Appelbe, Pittsburgh, for appellees.

Before: DEL SOLE, President Judge, EAKIN and TODD, JJ.

TODD, J.

■ ¶ 1 In this action, James T. Drum ("Drum") and Linda I. Drum appeal the judgment entered on a molded verdict against them and in favor of Appellees Shaull Equipment and Supply Company ("Shaull"), Larry Brown and Marlin Pentz in the Court of Common Pleas of Allegheny County.[1] This matter is before us on remand from the Supreme Court of Pennsylvania for reconsideration in light of the standard for review of the denial of a motion for a new trial recently enunciated by our Supreme Court in *Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000).[2] Upon review under *Harman,* we vacate the judgment in favor of Appellees and remand this matter for a new trial.

¶ 2 The facts underlying this personal injury action sounding in negligence may be summarized as follows. Drum was employed as a heating and plumbing installer by George Roth Heating and Plumbing ("Roth"). In February 1996, Shaull contracted with Roth for the installation of an overhead radiant heating system to be suspended from the ceiling in the service garage area of Shaull's facility north of Pittsburgh in Bakerstown, Pennsylvania. Roth assigned Drum to the Shaull project. Brown was Shaull's Service Manger while Pentz was the branch manager of the Bakerstown branch.

¶ 3 Early in the project, Drum and his co-workers were discussing the equipment necessary to complete the project. Included in the discussion was the need for scaffolding to reach the ceiling area. Brown apparently overheard this discussion and volunteered the use of Shaull's forklift. The parties dispute the precise nature and effect of this exchange. Drum testified that Brown said: "You can use the forklift there. You can put a pallet on it and lift yourself up and work off the pallet." (N.T. Trial, 1/11/99, at 338.) Brown, however, testified that he had suggested that the Roth employees use the forklift in order to remove a piece of equipment, not for use as a work platform. Specifically, Brown testified that:

> When I gave them the forklift to use for the intentions that I gave it to them, to lower an old heating unit down, there was never any thought or mention or asking if they could use it for a work platform following the use of that forklift. They just went ahead and did it on their own.

(N.T. Trial, 1/7/99, at 51.) Brown did testify, however, that prior to Drum's injury he had become aware that the Roth employees were using the forklift and pallet as a work platform.

**1.** Appellants initially appealed from the May 28, 1999 Order denying their post-trial motions without first having judgment entered on the verdict. Such an appeal would be interlocutory absent final judgment and this Court would be without jurisdiction to hear it. *See Johnston the Florist, Inc. v. TEDCO Constr. Corp.,* 441 Pa.Super. 281, 287, 657 A.2d 511, 514 (1995). Pursuant to an Order of this Court, however, Appellants entered final judgment on April 18, 2000. Since entry of final judgment during the pendency of an appeal is sufficient to perfect our jurisdiction, *see id.* at 286, 657 A.2d at 513, we will address the appeal on its merits.

**2.** We note that in their briefs to this Court on remand, Shaull, Brown and Pentz were designated as Appellants while the Drums were called Appellees. To avoid confusion, we shall refer to the parties as they originally were designated before this Court and as they appear in the caption above.

¶ 4 It is undisputed that Drum was using the forklift and pallet as a work platform on February 15, 1996. On that date, the end of a section of heater pipe that Drum was installing came loose and began to fall. Drum attempted to catch the pipe as it fell toward the floor. In so doing, Drum fell off of the pallet headfirst to the floor. As a result, he suffered injuries to his spine that rendered him partially paralyzed.

¶ 5 Appellants sued Shaull, Brown and Pentz claiming negligence and strict liability. The case was tried to a jury under three specific theories of liability: (1) control of the workplace; (2) negligent supply of a chattel for business purposes; and (3) vicarious liability based on the peculiar risk doctrine. During deliberations, the jury made two requests. The first was to see the written charge, which was denied. The second was to be recharged on negligence and contributory negligence, which was granted.

¶ 6 The jury initially returned a verdict by special interrogatories that, according to the trial court:

indicated that it had found Defendants Brown and Pentz were not negligent, but attributed percentages of that causal negligence of 2.5% and 0.5% to each Defendant respectively. The Court reviewed these interrogatories and, in the presence of counsel, *sua sponte* informed the jury of this inconsistency and instructed the jury to return to the jury room to redeliberate.

(Trial Court Opinion, 5/28/99, at 4.) The precise words used by the trial court to inform the jury of this inconsistency and to direct them to take further action were, "[w]e have an inconsistent verdict, incorrect verdict. I think the best thing to do is to send you back upstairs to correct it." (N.T. Verdict, 1/14/99, at 2.)

¶ 7 After the jury retired for redeliberation, Appellees moved for a mistrial on the basis that "[t]he jury obviously did not understand your instructions with respect to the law in this case; and it's evidenced by the verdict slip." (*Id.* at 4.) Appellants joined in the motion for a mistrial, which was denied by the trial court.

¶ 8 When the jury returned again, the trial judge elected to read the special interrogatories himself due to the "inexperience of the tipstaff." (Trial Court Opinion, 5/28/99, at 5.) The jury found Shaull negligent, but Brown and Pentz not negligent, and found that Shaull's negligence was a substantial factor in causing Drum's injury. The jury further found, however, that Drum had been contributorily negligent in causing his own injury and apportioned his negligence at 58% and Shaull's at 42%. Because Drum's contributory negligence exceeded Shaull's negligence, the trial court molded the verdict to a defense verdict. Appellants' counsel then requested that the jury be polled.

¶ 9 On the questions of whether Shaull and Pentz were negligent, the polling conformed to the written interrogatories. On the question of whether Brown was negligent, the trial court indicated that on the verdict slip ten jurors had answered "no" while two had answered "yes". During the initial poll of the jury, however, the trial court stopped the polling after three jurors (jurors number one, three and six) orally answered "yes". The trial court then repolled the jury on question two. On the second poll, juror six changed his answer to "no". Thus, the total on the second poll of this question was the same as on the written interrogatories.

¶ 10 This difficulty recurred on the question of whether Shaull's negligence had caused Drum's injury. The trial court indicated that ten of the jurors had answered "yes" while two had answered "no". On polling, however, a different combination of three jurors (jurors num-

ber three, four and five) orally answered "no", whereupon the trial court stopped the polling and repeated the question.

¶ 11 On the second poll, juror number two, who had answered "yes" on the first poll, answered "no", prompting the trial court to repeat the question and the vote totals as found on the written interrogatories. On the third poll, jurors number two and three answered "no". The poll then continued:

THE COURT: Juror Number 4?

JUROR NUMBER 4: No. I'm sorry. No.

THE COURT: Juror Number 5?

[DRUM'S COUNSEL]: Four no?

JUROR NUMBER 4: I apologize, yes.

THE COURT: You mean, Juror Number 4 means yes. Juror Number 5?

JUROR NUMBER 5: No.

THE COURT: All right. Well, that's still three no's. We have 10 to 3.

(N.T. Verdict, 1/14/99, at 13–14.)

¶ 12 The trial court then questioned whether the jury was "still confused about the question" or whether there had been a scrivener's error. In response to the trial court's question, the following exchange occurred:

THE FOREMAN: I believe we're just—some people are confused.

THE COURT: They're confused about the answer?

THE FOREMAN: Yes.

(*Id.* at 14–15.) The trial court then asked the jury to retire to "get the answer straight." (*Id.* at 16.) When they returned, the polling on the question of Shaull's causation of Drum's harm conformed to the written interrogatories.

¶ 13 The next question was whether Drum was contributorily negligent. During the poll, juror number four answered "no". The trial court stated that the verdict slip indicated a unanimous vote and asked: "Does Juror Number 4 not under-

stand the question? Was your vote totalled incorrectly by the Foreman or are you confused when I'm asking you orally what your vote was?" (Id. at 20.) Juror number four replied, "I was confused now." The exchange then continued:

THE COURT: Okay. Do you believe by a preponderance of the evidence that the Plaintiff, James Drum, was contributorily negligent?

JUROR NUMBER 4: Yes, he was, sir.

(*Id.*) The polling on the final two questions conformed to the verdict slip and the jury was released.

¶ 14 The trial court denied appellants' post-trial motions for a new trial and this timely appeal followed. On post-trial motions and in the present appeal, Appellants raised seven specific allegations of error:

1) Should a new trial be granted where no verdict was rendered in the trial court because the jury was denied the opportunity to announce orally its verdict in open court, as is required by Pennsylvania law?

2) Should a new trial be granted where the trial court improperly interfered with the jury's deliberations?

3) Should a new trial be granted where the trial court's binding instruction on the doctrine of peculiar risk was legally erroneous and prejudicial to [Appellants]?

4) Should a new trial be granted where the trial court gave an erroneous and prejudicial jury instruction on [Appellants'] theory of negligent supply of chattel for a business purpose?

5) Should a new trial be granted where the trial court erred in refusing to delineate [Appellants'] three theories of negligence on the verdict slip?

6) Should a new trial be granted where the jury was confused and therefore

unable to deliver a reasoned and rational verdict?

7) [Should] [j]udgment n.o.v. or a new trial be granted where the trial court erred in refusing to grant [Appellants'] requests for a binding jury instruction on [an Appellee's] negligence and for judgment n.o.v., despite [Appellee's] admission at trial that he was negligent?

(Appellants' Brief, at 2.)

¶ 15 As a threshold issue however we first must address Appellees' contention that Appellants have waived their allegations of error regarding the jury instructions, the trial court's conduct during deliberations, and the impropriety in the announcement of the verdict, by failing to preserve them via appropriate objection at trial. After a thorough review of the record, we find that these issues adequately were preserved for our review.

¶ 16 As to Appellants' arguments regarding jury instructions, Appellants submitted[3] each of the requested instructions to the trial court in writing and made certain subsequent oral requests for modification. At the charge conference, the trial court noted:

> THE COURT: You guys have objections to every ruling that goes against you during these points for charge. You don't have to make an objection or an exception. If you are ruled against, it's noted.
>
> * * *
>
> THE COURT: You can do it at the end of the charge, too, if you want, but that's up to you. Nothing is deemed

waived if your charges are not accepted.

(N.T. Trial, 1/12/99, at 185.) Thus, Appellants' allegations of error regarding the jury charge were preserved at trial.

¶ 17 Appellees also challenge the preservation of Appellants' claims regarding the trial court's conduct during deliberation and the announcement of the verdict. While Appellants' counsel failed to articulate specific objections during jury deliberations, these claims were preserved by virtue of Appellants previously having joined Appellees' motion for a mistrial due to jury confusion. Once an issue has been raised, counsel is not required to continue repeating the objection. *See Collins v. Cooper,* 746 A.2d 615, 619 n. 2 (Pa.Super.2000) (holding issue not waived by counsel's failure to object during closing argument to opposing counsel's reference to previously disputed testimony already admitted by trial court over counsel's objection; "[s]ince the trial court overruled this objection and admitted the ... testimony into evidence, it would have been redundant for appellant to repeat his already overruled objection during closing argument.").

¶ 18 We now turn to the merits of Appellants' challenge to the trial court's denial of their motion for a new trial. As noted above, in *Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000), the Supreme Court of Pennsylvania recently reexamined the appropriate review of a motion for a new trial at both the trial court and appellate levels. The Court cautioned in *Harman* that "[a]lthough all new trial or-

---

**3.** We note that the original record transmitted from the trial court does not contain Appellants' requested points for charge in their entirety and the docket does not reflect that they were filed. The transcript of the charge conference confirms, however, that they were presented to and considered by the trial court. In addition, excerpted pages from Appellants' requested points for charge containing the particular requested points on peculiar risk and negligent supply of a chattel for business purposes were included in the voluminous Appendix filed by Appellants in the trial court and, thereby, made part of the original record before this Court.

ders are subject to appellate review, it is well-established that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Id.* at 466, 756 A.2d at 1121–22.

■ ¶ 19 In *Harman,* the Court noted that the trial court must follow a two-step process in responding to a request for a new trial. The trial court must determine whether a factual, legal or discretionary mistake was made at trial. *Id.* at 467, 756 A.2d at 1122. If the trial court determines that one or more mistakes were made, it must then evaluate whether the mistake provided a sufficient basis for granting a new trial. *Id.* Moreover, the Court noted that "[a] new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.* (citations omitted).

■ ¶ 20 The Court then set forth an additional two-step analysis for appellate review of a trial court's determination to grant or deny[4] a new trial. First, the appellate court must examine the decision of the trial court to determine whether it agrees that a mistake was, or was not made. *Id.* In so doing, the Court noted that the appellate court must apply the appropriate standard of review. If the alleged mistake involved an error of law, the appellate court must scrutinize for legal error. *Id.* at 468, 756 A.2d at 1123. If the alleged mistake at trial involved a discretionary act, the appellate court must review for an abuse of discretion. *Id.* The Court reiterated that a trial court abuses its discretion by rendering a judgment that is manifestly unreasonable, arbitrary or capricious, or failed to apply the law, or

was motivated by partiality, prejudice, bias or ill will. *Id.* at 469, 756 A.2d at 1123 (citations omitted).

■ ¶ 21 If the appellate court agrees with the trial court's determination that there were no prejudicial mistakes at trial, then a decision by the trial court to deny a new trial must stand and we need not reach the second prong of the analysis. If the appellate court discerns that a mistake was made at trial, however, it must analyze whether the trial court abused its discretion in ruling on the motion for a new trial. *Id.* at 468, 756 A.2d at 1123.

¶ 22 In the present case, the trial court reviewed Appellants' allegations of error and determined that no error had occurred. On appeal, therefore, this Court must examine the specific allegations of error by the trial court to determine whether there indeed were mistakes made at trial. If we determine that there were, we must then determine whether the trial court abused its discretion in denying the motion for a new trial.

¶ 23 As their first issue, Appellants argue that "the jury must *orally* announce its findings in open court or else the verdict is invalid." (Appellants' Brief, at 24 (emphasis original).) Appellants' argument that there was no verdict in the present case is based on the fact that the trial court employed written interrogatories to the jury that were read by the trial judge, not by the jury foreman.

¶ 24 The record reveals, however, that the foreman did announce orally in open court and in the presence of the parties and their counsel that the jury had reached a verdict. The trial judge elected to read aloud the jury's responses to the written interrogatories onto the record

---

**4.** The court specifically held that a review of a denial of a new trial requires the same analysis as a review of an order granting a new trial. *Id.* at 467, 756 A.2d at 1122 (citations omitted).

himself, again in open court and in the presence of the parties and their counsel. (N.T. Verdict, 1/14/99, at 2, 6–7.)

▆▆▆ ¶ 25 We agree with Appellants that Pennsylvania law is well-settled that jury verdicts must be announced in open court and in the presence of the parties and their counsel in order to be valid. *See Barefoot v. Penn Central Transp. Co.*, 226 Pa.Super. 558, 560–561, 323 A.2d 271, 272 (1974) ("the only verdict is that which is announced orally in court by the jury, and if at any time any juror disagrees, with or without poll, before the verdict is recorded then there is no verdict"). We further note, however, that the use of written interrogatories to the jury is appropriate and has become commonplace in complex litigation. *See Henery v. Shadle*, 443 Pa.Super. 331, 336 n. 1, 661 A.2d 439, 442 n. 1 (1995). None of the cases relied upon by Appellants in support of their argument on this point specifically address the reading by the trial court of special interrogatories answered by the jury.

▆▆▆ ¶ 26 In denying Appellants' post-trial motion on this basis, the trial court concluded:

> The fact that the special interrogatories were read by the Court, and not by the foreperson, is of little import in this case. No one on the jury rose to voice any disagreement with the verdict as read. Nor did [Appellants'] counsel raise any objection. . . . The long-standing requirement that the jury's verdict be announced openly in court was clearly met in this case by the Court's reading of the special interrogatories and the subsequent jury poll.

(Trial Court Opinion, 5/28/99, at 6–7 (citations omitted).) We agree with the trial court that the oral announcement that the jury had reached a verdict, combined with the oral reading of the jury's responses to the special interrogatories, was sufficient to meet the requirements of oral pronouncement of the verdict, especially when combined with a subsequent poll of the jury that ultimately agreed with the written interrogatories.

▆▆▆ ¶ 27 The fact that during the polling, members of the jury initially announced votes that did not conform to the vote totals indicated on two of the written interrogatories does not change this conclusion because the trial court ultimately did obtain votes during polling that conformed to the written totals for each of those questions. It is unclear from the record, therefore, whether these jurors momentarily may have disagreed with the verdict only to affirm it in the final poll, whether they merely were confused by the oral questioning process or whether they were more profoundly confused by the facts and legal issues pertaining to this action.[5] The record is clear, however, that the jury ultimately affirmed the verdict by poll prior to its being recorded.

¶ 28 Because the jury announced through its foreman in open court that it had reached a verdict, submitted answers to special interrogatories indicating this and, ultimately, agreed with the verdict when polled, we will not reverse on the technical basis that the jury failed to reach a verdict. Accordingly, we hold that the trial court properly determined that the employment of this procedure did not constitute reversible error.

¶ 29 Although we disagree with Appellants' argument that the difficulties revealed during the polling of the jury render the verdict a nullity, we will consider these irregularities as part of our consideration of Appellants' sixth issue. Appellants argue that the trial court abused its discretion in failing to grant a new trial on

---

**5.** We consider the issue of jury confusion below.

the basis that "the jury was confused and therefore unable to deliver a reasoned and rational verdict." (Appellants' Brief, at 2.) Appellants argue that "[t]he jurors' deliberations were fraught with chaos and confusion." (Appellants' Brief, at 46.) As indicia of this "profound confusion", Appellants point to: (1) the jurors' requests to be recharged; (2) their inconsistent answers to the general verdict finding Brown and Pentz not to be negligent, yet assigning percentages of responsibility to them; (3) their "incongruous and inconsistent polling votes"; (4) the joint motion for a mistrial; and, (5) the colloquy between the trial court and the jury foreman "during which the foreman expressly stated to the judge that the jury was confused." (*Id.* at 46–47.)

¶ 30 The trial court stated in its opinion that it "took great pains to ascertain the nature of this confusion." (Trial Court Opinion, 5/28/99, at 7.) Indeed, the trial court acknowledged that "the record does reveal some confusion on the part of the jury and a statement from the foreperson that some jurors were confused ..." and that "the record clearly indicates that the jurors may have been confused by the questions on the special interrogatories...." (*Id.*) The trial court concluded, however, that the jury was not confused "on the application of the law to the facts" and that "any confusion resulted from the complexity of the case and the special interrogatories in combination with the emotions of the moment." (*Id.*) Ultimately, the trial court concluded that "[t]his jury was neither coerced or confused." (*Id.*, at 3.)

■ ¶ 31 On review, we find that this conclusion was manifestly unreasonable and, thus, constituted an abuse of discretion. Contrary to the trial court's conclusion, the record is clear in the present case that the verdict ultimately delivered by the jury was inherently inconsistent and should not have been permitted to stand. The difficulties with the oral polling of the jury were symptomatic of the confusion that appears from the record to have pervaded this jury's deliberations.

¶ 32 Confusion was apparent almost from the outset of this jury's deliberations. The jury first asked to view the written charge. When the trial court refused that request, the jury requested to be recharged on a certain point. Questions from the jury and requests to be recharged are common and most certainly do not create a presumption of jury confusion. In the present case, however, these requests were the first indicia of a problem that soon should have become readily apparent.

¶ 33 The jurors' confusion was demonstrated by their initial inconsistent verdict that prompted the joint mistrial motion, by the inconsistencies and changes in the votes during the oral poll, and by the jury foreman's statement that the jury was "confused." This confusion further was apparent in the inconsistencies between the votes of two of the individual jurors. Jurors number three and five consistently voted that Shaull had not been negligent and that Shaull's negligence had not been a proximate cause of Drum's injury. (N.T. Verdict, 1/14/99, at 8, 12–14, 18.) However, those same two jurors irreconcilably joined in the unanimous apportionment of 42% negligence to Shaull. (*Id.* at 22–23.)

■ ¶ 34 If a jury clearly is confused, and the trial court cannot rectify the confusion by appropriate instructions, a new trial is warranted. *See Pennsylvania Dep't of Transp. v. Nemiroff*, 42 Pa. Cmwlth. 478, 480, 401 A.2d 10, 12 (1979) ("Where the record discloses a substantial degree of uncertainty and confusion in the minds of the jury, justice requires the granting of a new trial."); *Leopold v. Davies*, 246 Pa.Super. 176, 180, 369 A.2d 868,

870 (1977) ("Since we are convinced that the jury was . . . confused as to the application of the law of contributory negligence in this case, a new trial is required.").

¶ 35 In the present case, as the trial court acknowledges, the record clearly reveals that the jury was confused. The record similarly is clear that the trial court's efforts to ascertain and rectify that confusion were unavailing. We hold, therefore, that it was reversible error to permit the jury to continue its deliberations and to record a verdict after it became painfully obvious that this jury was hopelessly confused.

¶ 36 Having so concluded, we arrive at the final step of the *Harman* analysis, which requires us to determine whether the trial court further abused its discretion in denying the request for a new trial. *Harman*, 562 Pa. at 470, 756 A.2d at 1124. In so doing, we are mindful of the Supreme Court's admonitions that "[t]he harmless error doctrine underlies every decision to grant or deny a new trial" and that in order to obtain a new trial, "the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.* at 467, 756 A.2d at 1122.

■ ¶ 37 As support for its decision to deny the motion for a new trial despite the acknowledged confusion, the trial court noted in its opinion that the jury "without any hesitancy, found [Drum] to be more responsible for his injuries than any of the [Appellees]." (Trial Court Opinion, 5/28/99, at 7.) We can discern no basis from the record, however, to deem the jury's apportionment of negligence to be the result of reasoned and rational deliberation when the jury clearly was profoundly confused during the deliberations and pronouncement of the verdict. As Appellants were denied recovery completely by the jury's verdict, they have shown prejudice.

¶ 38 Thus, we hold that the trial court's error was not harmless and that the trial court abused its discretion in denying Appellants' request for a new trial. Accordingly, we are constrained to reverse the learned trial court's denial of Appellants' post-trial motion on the issue of jury confusion and remand this matter for a new trial.

■ ¶ 39 Having done so, we need not reach Appellants' arguments that the trial court improperly interfered with the jury's deliberations. We also will not address Appellants' argument that the trial court erred in failing to delineate their three separate theories of negligence on the verdict slip. In support of this proposition, Appellants make only a general argument that the verdict slip "violated [Appellants'] fundamental right to due process under the Pennsylvania and United States Constitutions." (Appellants' Brief, at 45.) Appellants do not develop this argument or cite to any caselaw in support of it. Accordingly, we deem it to have been waived. *See* Pa.R.A.P. 2119; *Collins*, 746 A.2d at 619 (holding claim of error waived when "appellant has failed to cite any authority in support of a contention"); *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 661–62 n. 8 (Pa.Super.1999) (same).[6]

¶ 40 Other issues remain which were raised by Appellants on appeal, have been briefed adequately, and are likely to recur on remand. For the guidance of the parties and the trial court, therefore, we will address these issues.

---

**6.** Even if we were to reach the merits of this issue, it is clear that the trial judge's discretion regarding the use and content of special interrogatories to the jury is broad. *See Hen-* *ery,* 443 Pa.Super. at 336 n. 1, 661 A.2d at 442 n. 1. In the present case, that discretion was not abused.

¶ 41 Appellants argue that the trial court erred in its charge to the jury on Pennsylvania law regarding the doctrine of peculiar risk by failing to include in the instruction specific language pertaining to vicarious liability. We have reviewed the charge and conclude that, when viewed in its entirety, it accurately, albeit in a less than concise manner, sets forth Pennsylvania law as articulated by this Court regarding this doctrine.

¶ 42 We question, however, whether such an instruction was warranted in the present case. Indeed, in their brief, Appellees argue, *inter alia,* that "the evidence at trial failed to justify a charge on the peculiar risk doctrine in any event." (Appellees' Brief at 12.)

■ ¶ 43 We have stated that the peculiar risk doctrine is an exception to "[t]he established law in Pennsylvania [that] provides that an employer or an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *Edwards v. Franklin & Marshall College,* 444 Pa.Super. 1, 4, 663 A.2d 187, 189 (1995). Under this exception, "an employer may be liable for the negligence of its employee/independent contractor where the work to be performed by the independent contractor involves a special danger or peculiar risk."[7] *Id.* at 5, 663 A.2d at 189.

¶ 44 Pennsylvania has adopted Sections 416 and 427A of the Restatement (Second) of Torts as setting forth the controlling law regarding the peculiar risk doctrine. *Emery v. Leavesly McCollum,* 725 A.2d 807, 814 (Pa.Super.1999) (citing *Philadelphia Elec. Co. v. James Julian, Inc.,* 425 Pa. 217, 228 A.2d 669 (1967)). These sections provide:

§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§ 427 A. Work Involving Abnormally Dangerous Activity

One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity.

Restatement (Second) of Torts §§ 416 and 427 A.

¶ 45 *Emery* is the most-recent pronouncement of this Court, sitting *en banc,* regarding the applicability of the peculiar risk doctrine. In *Emery* we set forth the two-pronged test to be applied by the trial court to determine whether the peculiar risk doctrine applies to a particular case as follows:

As set forth in our prior cases, the determination of whether either of these exceptions applies involves a two-fold test: (1) whether the risk is foreseeable to the owner at the time the contract is executed, *i.e.* would a reasonable person foresee the risk and recognize the need to take special measures; and (2) whether the risk is different from the usual

---

**7.** The term "employer" refers to the individual or entity that hires the independent contractor, in this case, Shaull.

and ordinary risk associated with the general type of work done.

*Emery,* 725 A.2d at 814.

¶ 46 This Court emphasized in *Emery* that "because the 'peculiar risk/special danger' doctrines are exceptions to a general rule [of non-liability], they should be viewed narrowly." *Id.* at 814. Moreover, we repeated that:

> The risk/danger must be recognizable in advance and contemplated by the owner at the time the contract was formed. It must not be a risk/danger "created solely by the contractor's 'collateral negligence,' ... [*i.e.*], negligence consisting wholly of the improper manner in which the contractor performs the operative details of the work."

*Id.* (citations omitted). Finally, we noted in *Emery* that the determination of whether the facts of a particular case constitute a peculiar risk is a mixed question of law and fact and that "the trial judge may make this determination as a matter of law in clear cases." *Id.* (citation omitted). In the present case, the trial court made no such determination, deciding instead, when ruling on Appellees' motion for a compulsory nonsuit, "to let the case go to the jury." (N.T. Trial, 1/12/99 at 13.) This was error.

¶ 47 We question whether Shaull could have foreseen that Roth's employees would use Shaull's forklift as a work platform in order to perform their obligations under the contract at the time that the contract was entered into between the parties. We further question whether the risk in the present case is different from the usual and ordinary risk associated with the general type of work to be done. We note that this second prong of the test consistently has been applied to determine whether the **nature** of work to be performed pursuant to the contract, not the particular tools or instrumentalities to be utilized, constitutes a peculiar risk. *See, e.g., Donnelly v. Southeastern Pa. Transp. Auth.,* 708 A.2d 145, 148–49 (Pa.Cmwlth. 1998) (working on a scaffold with only auxiliary lighting did not constitute a peculiar risk); *Motter v. Meadows Ltd. P'ship.,* 451 Pa.Super. 520, 529–530, 680 A.2d 887, 891 (1996) (affirming trial court's grant of summary judgment based on holding that digging a trench in soft shale did not constitute a peculiar risk); *Edwards,* 444 Pa.Super. at 9, 663 A.2d at 191 ("Clearly, the risk that Edwards might fall through the roof, given the known deteriorated condition of the building ... did not present a 'special danger' or 'peculiar risk.' "); *Steiner v. Bell of Pa.,* 426 Pa.Super. 84, 89–90, 626 A.2d 584, 587 (1993) (affirming grant of judgment on the pleadings based on holding that working on a ladder on overhead utility lines did not constitute a peculiar risk); *Peffer v. Penn 21 Assoc.,* 406 Pa.Super. 460, 466, 594 A.2d 711, 714 (1991) ("work on a ladder while tightening bolts of a steel structure is not a peculiar risk for an individual employed by a steel erector company").

¶ 48 Finally, we note that, contrary to Appellants' assertion, *Cox v. Turner Constr. Co.,* 373 Pa.Super. 214, 540 A.2d 944 (1988), does not compel a finding that the facts of the present case constitute a peculiar risk. In *Cox,* we concluded, based on the facts of that case, that "[t]he operation of an unenclosed hoist contrary to safety regulations constitutes a peculiar risk of harm." *Id.* at 227, 540 A.2d at 950. We do not have the benefit of a detailed analysis of the legal underpinnings of the peculiar risk doctrine as applied to the facts of the case in *Cox.*[8] To the extent that

---

**8.** It is reasonable to suppose, however, that the parties in *Cox* indeed contemplated the use of the hoist by the independent contractor when the contract was entered into. The project at issue in *Cox* was the construction of a skyscraper and the independent contractor was hired to install the elevators and escalators in the building. As the building's eleva-

the result in *Cox* was based on the fact that the hoist was operated in a manner "contrary to safety regulations," however, subsequent decisions of this Court have made clear that a violation of safety standards or regulations standing alone is not sufficient to constitute a peculiar risk. *See Lorah v. Luppold Roofing Co.*, 424 Pa.Super. 439, 445, 622 A.2d 1383, 1386 (1993) ("[T]he tenor of our law is that the violation of safety conditions alone cannot be the basis for a finding that the Peculiar Risk Doctrine applies, as many, if not most, industrial [accidents] result from a failure to follow ... safety regulations."); *Peffer*, 406 Pa.Super. at 465, 594 A.2d at 713 ("Violation of .safety conditions alone, however, cannot be a basis for carving out exceptions to the rule that the owner is not liable for injuries incurred by employees of a subcontractor, as to do so would nullify the rule for all practical purposes since many, if not most, industrial accidents can be attributed to a failure to comply with safety regulations of either state or federal agencies.").

¶ 49 The present case went to trial in early January 1999, one month before this Court filed its *en banc* opinion in *Emery*. We acknowledge, therefore, that the trial court did not have the benefit of this Court's analysis in *Emery* when it decided Appellees' motion for a compulsory nonsuit or when it charged the jury in the present case. Accordingly, we direct the trial court on remand to determine as a threshold issue whether the facts of this case meet the criteria for application of the peculiar risk doctrine.

¶ 50 Appellants also argue that the trial court erred in its charge to the jury on Pennsylvania law regarding negligent supply of a chattel for business purposes pursuant to Section 392 of the Restatement (Second) of Torts.[9] The parties do not dispute the propriety of the trial court's general instruction under Section 392. Appellants argue, however, that the trial court erred in including in its charge an instruction based on Comment e to Section 392, which provides:

> e. *Supplying tools for workmen.* One who employs another to erect a structure or to do other work, and agrees for that purpose to supply the necessary tools and temporary structures, supplies them to the employees of such other for a business purpose. This is true irrespective of whether the structure or work when finished is to be used for business or residential and social purposes. On the other hand, if it is understood that the person who is to do the work is to supply his own instrumentalities, but the person for whom the work is to be done permits his own

---

tors obviously could not have been in place and functioning prior to the completion of the independent contractor's efforts, it is reasonable to assume that the parties contemplated that the independent contractor would use that hoist to reach the upper levels of the unfinished skyscraper.

9. Section 392 provides:
   § 392. Chattel Dangerous for Intended Use
   One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied
   (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
   (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.
   Restatement (Second) of Torts § 392.

tools or appliances to be used as a favor to the person doing the work, the tools and appliances are supplied as a gratuity and not for use for the supplier's business purposes.

Restatement (Second) of Torts, § 392 cmt. e.

¶ 51 This Court has relied upon Section 392 as setting forth Pennsylvania law regarding negligent supply of a chattel. *See, e.g., Fullard v. Urban Redev. Auth. of Pittsburgh,* 222 Pa.Super. 184, 187, 293 A.2d 118, 120 (1972). Moreover, we have relied as well upon the text of the Comments to Section 392, including Comment e. *See id.* (relying on the first sentence of Comment e in holding that "Comment e of § 392 specifically states that one who makes such an agreement is supplying the tools for a business purpose, and, therefore, is subject to the higher duty of care imposed upon such a supplier."). *See also, Donaldson v. Pennsylvania. Dep't of Transp.,* 141 Pa.Cmwlth. 474, 492, 596 A.2d 269, 278 (1991) (holding on the facts of that case that Comment e to Section 392 was inapplicable), *overruled in part on other grounds, Leonard v. Pennsylvania. Dep't of Transp.,* 565 Pa. 101, 107, 771 A.2d 1238, 1241 n. 2 (2001).

¶ 52 Appellants argue that the trial court should not have included this instruction because it applies *"only* in the situation were [sic] where there is a preexisting agreement that the contractor will supply his own instrumentalities." (Appellants' Brief at 43 (emphasis original).) Appellees counter that the plain language of Comment e "simply states that 'if it is *understood* that the person who is to do the work is to supply his own instrumentalities.'" (Appellees' Brief at 19 (quoting Restatement (Second) of Torts § 392,

Comment e) (emphasis original in Appellees' Brief).) [10]

¶ 53 In the absence of an integrated, written agreement, and the record reveals no such agreement between Roth and Shaull, "[t]he determination of the contents of a mixed written and oral contract is for the factfinder unless there is no conflicting evidence." *Peugeot Motors of America, Inc. v. Stout,* 310 Pa.Super. 412, 418–419, 456 A.2d 1002, 1005 (1983). Thus, the trial court properly permitted the jury, with appropriate instruction, to determine the nature of the understanding between Roth and Shaull regarding who would provide the tools and instrumentalities necessary to complete the work. Accordingly, we find no error in the trial court's instructions to the jury under this section.

¶ 54 Finally, Appellants argue that the trial court erred in refusing to grant a binding instruction on the issue of Brown's negligence. The sole case cited by Appellants in support of this proposition, *Duquesne Light Co. v. Woodland Hills Sch. Dist.,* 700 A.2d 1038 (Pa. Cmwlth.1997), actually supports Appellees' argument that the refusal to grant the instruction was appropriate. In *Duquesne Light,* the Commonwealth Court held that the trial court committed reversible error by granting a binding instruction on negligence because "[t]he issue of whether a party is negligent is appropriate for the jury to determine." *Id.* at 1046. Moreover, the Commonwealth Court stated that "[w]here there is any evidence which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof." *Id.*

10. Although this section does not use the term agreement or contract and refers instead to the parties' understanding, we will analyze this issue under contract law. *See Black's Law Dictionary* 1527 (7th ed.1999) (defining "understanding" as, *inter alia,* "[a]n agreement, esp[ecially] of an implied or tacit nature.").

¶ 55 The Commonwealth Court's reasoning in *Duquesne Light* is consistent with the principles of negligence and the purview of the jury that have been enunciated by this Court. *See Dible v. Vagley*, 417 Pa.Super. 302, 307, 612 A.2d 493, 495 (1992) ("binding instructions may not be given if there is a question of fact properly submissible to the jury"); *Dougherty v. Boyertown Times*, 377 Pa.Super. 462, 481, 547 A.2d 778, 787 (1988) ("Negligence is a question for the jury to determine upon proper instruction. The court should not remove the question from the jury unless the facts leave no room for doubt."). We hold, therefore, that the trial court did not abuse its discretion in refusing to give an instruction that Appellee Brown was negligent as a matter of law.

¶ 56 Based on the foregoing, we vacate the judgment entered April 18, 2000 and reverse the trial court's Order of May 28, 1999 denying Appellants' Motion for Post–Trial Relief. We remand this matter for a new trial.

¶ 57 Reversed and remanded. Jurisdiction relinquished.