J-S16006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KYLE BYRD | |
| Appellant | No. 1328 EDA 2015 |

Appeal from the Judgment of Sentence June 10, 2011
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009478-2009

BEFORE:  OTT, J., DUBOW, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                **FILED FEBRUARY 23, 2016**

Kyle Byrd files this direct appeal from his judgment of sentence for involuntary deviate sexual intercourse ("IDSI"), sexual assault and terroristic threats.[1]  We affirm.

On January 6, 2011, a jury found Byrd guilty of IDSI, sexual assault, and terroristic threats but not guilty of rape, unlawful restraint, and possession of an instrument of crime.  On June 10, 2011, the trial court sentenced Byrd to consecutive periods of imprisonment of 4-20 years for IDSI and 2-10 years for sexual assault, for a total period of confinement of 6-30 years, followed by a consecutive term of 5 years' probation for terroristic threats.  Byrd filed a timely appeal, but on August 29, 2011, the

_____

[1] 18 Pa.C.S. §§ 3123(a)(1), 3124.1, and 2706, respectively.

Superior Court dismissed his appeal for failure to file a docketing statement.

On October 12, 2012, Defendant filed a timely petition under the Post Conviction Relief Act ("PCRA") seeking reinstatement of his direct appellate rights. On April 23, 2015, by agreement of the Commonwealth, the trial court granted Byrd's petition to reinstate his direct appeal rights. On April 28, 2015, Byrd filed a timely notice of appeal. Both Byrd and the trial court have complied with Pa.R.A.P. 1925.

Byrd raises three issues in this appeal, which we have re-ordered for purposes of disposition:

1. Whether the verdict [of guilt for IDSI and sexual assault] was contrary to law?

2. Whether the [trial] court abused its discretion when it denied [Byrd's] motion for mistrial?

3. Whether the trial court abused its discretion in sentencing [Byrd] to a harsh and excessive sentence?

Brief For Appellant, at 7.

Byrd's first argument is a challenge to the sufficiency of the evidence. When examining such challenges, the standard we apply is

whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The

Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super.2011).

The trial court accurately summarized the evidence adduced during trial as follows:

The complainant, [Z.P.], testified that on June 8, 1998, she was 19 years old, lived in the City of Philadelphia, and was only a few weeks away from graduating high school. At that time, [Z.P.] worked after school to earn some money at a neighborhood bakery called Cookie Jar.  Because she did not own a car she usually walked to and from work. On June 8, 1998, [Z.P.] left work around 5:00 p.m. and was walking towards her boyfriend's house when [Byrd], a casual acquaintance whom she only knew by the name of 'Rob', drove up alongside her and started a conversation.  After talking with her for a few minutes, [Byrd] offered her a ride to her boyfriend's house. She accepted because [Byrd] seemed very friendly and her boyfriend lived only a few blocks away.

When [Z.P.] noticed [Byrd] had driven past her boyfriend's house she told him to stop. She testified that when she tried to get out, she heard [Byrd] lock the car doors, including the childproof locks, preventing her from opening the passenger door. At this point she became frightened because she was trapped inside [Byrd]'s car.

[Byrd] then demanded that she give him oral sex, which she quickly refused.  [Byrd] became upset and pulled his car over behind a Pep Boys.  She testified that [Byrd] grabbed her by her hair and dragged her into the back seat. She screamed and fought with [Byrd], but he overpowered her and removed her clothes. She kept trying to get back up, but [Byrd] repeatedly hit her in the face, knocking her back down. [Byrd] then jumped on

- 3 -

top of her and penetrated her vaginally. He then told her to put her clothes back on and get in the front seat.

[Byrd] then drove [Z.P.] to an empty parking lot several blocks away. She testified that as soon as they arrived, [Byrd] attacked her a second time and removed her clothes. [Byrd] twisted her head until she faced the back seat. He forced her to lie in between the driver and passenger seat on her stomach, and penetrated her both anally and vaginally. She testified that she struggled with [Byrd] and tried to fight him off, but she was overpowered.

Afterwards, [Byrd] drove [Z.P.] to a park a block away from her boyfriend's house. She testified that before [Byrd] released her, he warned her: 'I know where you live at. If you tell anyone, I'm coming for you. Just remember this face,' and showed her a knife that he had in his glove compartment. She testified that after [Byrd] threatened her, he finally released her and quickly drove away.

[Z.P.] testified that she was in a tremendous amount of pain but walked as quickly as she could from the park to her boyfriend's house. When her boyfriend's sisters opened the door for her, she told them that she had just been raped. The sisters called an ambulance for her because she had passed out. When [Z.P.] arrived at the hospital, the staff performed a series of tests on her, including a rape kit.

[L.P.], [Z.P.'s] mother, testified that she was at home with her husband when she received a call from the hospital. On arriving at the hospital she found her daughter 'sitting in a corner in a chair. She was crying. She looked beat up, bruised up. Her eyes were red. She was holding on to her clothes.' She testified that [Z.P.] was too upset to tell her what had happened for over a year, and that her daughter's personality changed because of the traumatic experience.

At some point after leaving the hospital, [Z.P.] gave a statement to the police and met with a sketch artist to create a composite of her attacker. The police also took photographs to capture her bruises, cuts, and black eye. She testified that her face was scratched and bruised, she had a black eye from being hit, and she was unable to use the bathroom for several days due to her anal abrasions. For months after leaving the hospital she had a

- 4 -

difficult time controlling her emotions because the assault constantly played over and over again in her head. She also testified that she is still suffering from chronic neck pain and takes pain relief medicine daily.

[Z.P.] testified that for the first year after the assault, she constantly called the police to see if her attacker had been caught, but was always told, 'We are doing what we need to do to catch him. When we catch him, we'll give you a call.' She thought the police had forgotten about her and stopped calling. Almost 11 years later in 2009, she was contacted by the Philadelphia Police and asked to come in to give a statement. She testified that the police took a second statement from her and showed her a photo array, from which she positively identified [Byrd]'s photo.

Philadelphia Police Detective Kevin Gage testified that he is a 13 year veteran of the Special Investigations Unit investigating cold cases. He testified that although [Z.P.]'s case had been classified as a cold case, it became active after new evidence was discovered, at which time, in January 2009, he was assigned to her case. He testified that [Z.P.]'s rape kit, prepared at Jefferson Hospital at the time of her assault, had been submitted to the police department's chemical lab to test for evidence. He further testified that almost 11 years later in 2009, the chemical lab notified his office that [Byrd] was a possible match to the DNA found in [Z.P.]'s rape kit. Detective Gage located [Byrd] and obtained a fresh comparison, and he testified that [Byrd]'s DNA was in fact an exact match. Based on this DNA evidence, Detective Gage prepared a photo array of 8 photos containing [Byrd]'s photo to display to [Z.P.] He testified that on displaying the photo array to [Z.P.], she immediately identified [Byrd] as her attacker, and 'she was sure that he was her attacker.' Detective Gage then prepared an arrest warrant for [Byrd], who later turned himself into the police.

Pa.R.A.P. 1925(a) Opinion, at 3-7. To this summary, we add that Z.P. testified that she did not want to have sexual intercourse with Byrd. N.T., 1/4/11, at 54.

The IDSI statute provides in relevant part: "A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant: (1) by forcible compulsion..."  18 Pa.C.S. § 3123(a)(1). The sexual assault statute provides in relevant part: "Except as provided in section 3121 (relating to rape) or 3123 (relating to involuntary deviate sexual intercourse), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent."  18 Pa.C.S. § 3124.1 "Deviate sexual intercourse" includes "sexual intercourse per os or per anus between human beings... The term also includes penetration, however slight..." 18 Pa.C.S. § 3101.

The Crimes Code defines "forcible compulsion" in relevant part as "compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101. This Court has observed that "forcible compulsion" is the exercise of sheer physical force or violence and has also come to mean an act of using superior force, physical, moral, psychological or intellectual to compel a person to do a thing against that person's volition and/or will.  ***Commonwealth v. Ables***, 590 A.2d 334, 337 (Pa.Super.1991).  A determination of forcible compulsion rests on the totality of the circumstances, including but not limited to this list of factors:

the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Commonwealth v. Rhodes*, 510 A.2d 1217, 1226 (Pa.1986).  It is not mandatory to show that the victim resisted the assault in order to prove forcible compulsion. *Id*.  The victim's uncorroborated testimony is sufficient to support a rape conviction.  *Commonwealth v. Wall*, 953 A.2d 581, 584 (Pa.Super.2008).

"Forcible compulsion" has a different meaning than "lack of consent". With regard to consent, the Crimes Code states: "The consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense." 18 Pa.C.S. § 311(a). "Forcible compulsion" means "something more" than mere lack of consent. *Commonwealth v. Smolko*, 666 A.2d 672, 676 (Pa.Super.1995). "Where there is a lack of consent, but no showing of either physical force, a threat of physical force, or psychological coercion, the 'forcible compulsion' requirement ... is not met." *Id*.

Here, Z.P. testified that Byrd sexually assaulted her twice inside his car: first vaginally behind a Pep Boys, and then both anally and vaginally in an empty parking lot.  On both occasions, Byrd physically overpowered her.

She never gave consent to Byrd. Construed in the light most favorable to the Commonwealth, this evidence was sufficient to prove the offenses of IDSI and sexual assault. Although Byrd points out several inconsistencies in Z.P.'s testimony – for example, her trial testimony that Byrd showed her a knife contradicted her statement to police that he showed her a gun – these discrepancies do not render the Commonwealth's evidence "so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Hansley*, 24 A.3d at 416.

In his second argument, Byrd contends that the trial court abused its discretion by denying his motion for a mistrial.

The factual backdrop for this claim is as follows. During Z.P.'s direct testimony, the prosecutor asked her to look at Commonwealth exhibit C-1. Z.P. stated that she was legally blind as of 2004 (six years after her encounter with Byrd). Z.P. testified that her blindness "actually happened [in] 2004. They said it was developing for a while, but it just started actually coming to the surface in 2004. They asked me when I went to the eye doctor, they asked me have I ever been hit in the eye before." N.T., 1/4/11, at 35. Byrd objected on the ground that there were no medical records to substantiate this testimony. *Id*. The court overruled Byrd's objection because Z.P.'s testimony was not offered to prove that Byrd caused the eye injury. Pa.R.A.P. 1925(a) Opinion, at 11. Upon overruling the objection, the Court instructed the jury that this testimony was not being

introduced to prove anything "except that somebody said to [Z.P.]: Were you hit in the eye?" N.T., 1/4/11, at 36.

Z.P. testified that in 1998, the year of the incident with Byrd, her vision was not 20/20 because she had astigmatism at that time, but her eye condition was "nothing close to what it is right now." N.T., 1/4/11, at 37. When asked if she had a degenerative condition, she answered: "It's not actually a degenerative thing. I also have a disease called sarcoidosis. It attacks certain parts of your body. Because my eye was so weak, it kind of attacked that, too. The eye was weak again because the doctor said I was hit in the eye. That eye was already a little bit weak because of the astigmatism. When somebody dealt a blow to it, it made it ten times weaker than what it already was." *Id*. at 37-38. The prosecutor asked if she would have a tough time reading exhibit C-1, adding: "That's the reason I am asking you these questions." *Id*. at 38. She answered: "I can see it. It will be hard for me to read it." *Id*.

At the conclusion of Z.P.'s direct testimony, Byrd requested production of her medical records relating to her eye treatment. N.T., 1/4/11, at 56. When it became apparent that the Commonwealth was unable to produce these records, Byrd moved for a mistrial due to his inability to confront Z.P. about her statements. *Id*. at 57. Byrd argued that Z.P.'s testimony created the implication that she now is blind due to her incident with Byrd, but the absence of medical documents left Byrd unable to confront Z.P. with any

contrary evidence in the documents. *Id*. at 56-57. The court took Byrd's motion under advisement, stating: "After you conclude your cross-examination, we will see." *Id*. At the conclusion of cross-examination, Byrd did not renew his objection.

Preliminarily, we determine that Byrd did not waive his motion for a mistrial by failing to renew his objection after Z.P.'s cross-examination. "Once an issue has been raised, counsel is not required to continue repeating the objection." *Drum v. Shaull Equipment and Supply Co.*, 787 A.2d 1050, 1055 (Pa.Super.2001).

We apply the following standard of review when addressing the denial of a motion for a mistrial:

> The trial court is in the best position to assess the effect of a prejudicial statement on the jury. Thus, the decision of whether to grant a mistrial is within the sound discretion of the trial court, and will not be reversed on appeal absent an abuse of that discretion. The remedy of a mistrial is an extreme one that is required only when an incident is of such a nature that its unavoidable effect is to deprive the defendant of a fair and impartial trial by preventing the jury from weighing and rendering a true verdict. Furthermore, a mistrial is not necessary if a court's cautionary instructions adequately cure any prejudice.

*Commonwealth v. Begley*, 780 A.2d 605, 624 -25 (Pa.2001).

The trial court properly reasoned in its Pa.R.A.P. 1925(a) opinion that the events in question did not warrant a mistrial. According to Byrd, Z.P. implied that Byrd struck her in the eye, thus causing her to go blind six years later in 2004. Z.P. said nothing of the kind. The most that we can

extract from her testimony is that she went blind due to sarcoidosis, a disease that attacked her eyes because she had been struck in the eye *on an unspecified occasion by an unidentified source*. This is a far cry from an accusation that Byrd struck her in the eye or caused her vision loss. Further, the Commonwealth asked Z.P. about her poor eyesight not to attribute her vision loss to Byrd but for a different and completely proper purpose, viz., to demonstrate why she had trouble reading a Commonwealth exhibit.

Nor did Byrd suffer prejudice from Z.P.'s statement about her eyesight. The court gave the jury a curative instruction that this testimony proved nothing except that "somebody said to [Z.P.]: were you hit in the eye?" N.T., 1/4/11, at 36. Through this directive, the court told the jury not to construe this testimony as an accusation against Byrd. When, as here, the court provides cautionary instructions to the jury, the law presumes that the jury will follow the instructions. ***Commonwealth v. Parker***, 957 A.2d 311, 319 (Pa.Super.2008). Nothing in the record renders this presumption inapposite. Furthermore, Byrd's acquittal of several serious charges (rape, unlawful restraint, and possession of an instrument of crime) indicates that the momentary references to Z.P.'s eye condition did not poison the jury. ***See Commonwealth v. Valerio***, 712 A.2d 301, 304 (Pa.Super.1998) (fact that jury acquitted defendant of several serious offenses indicated that reference to unrelated criminal activity did not cause prejudice).

In his final argument, Byrd contends that his aggregate sentence of 6-30 years' imprisonment is excessive, because he should have received concurrent sentences on his IDSI and sexual assault convictions instead of consecutive sentences.

There is no automatic right to appeal from the discretionary aspects of a sentence; instead an appellant must petition this Court for allowance of appeal. 42 Pa.C.S. § 9781(b). An appellant challenging the discretionary aspects of his sentence

> must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Commonwealth v. Allen***, 24 A.3d 1058, 1064 (Pa.Super.2011).

Here, defendant failed to preserve his claim at sentencing or in a motion to reconsider and modify sentence. ***See Commonwealth v. Jones***, 858 A.2d 1198, 1204 (Pa. Super. 2004) ( "We have held that an objection to a discretionary aspect of a sentence is clearly waived if it was neither raised at the sentencing hearing nor raised in a motion to modify the sentence imposed at that hearing").

In addition, Byrd fails to raise a substantial question that his sentence is inappropriate. "Where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the

Sentencing Code." ***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa.Super.2010). Furthermore, the imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment. ***Id***. at 171-72. In this case, Byrd's minimum IDSI sentence of 6 years falls within the standard Guidelines range of 60-78 months, and his minimum sexual assault sentence of 2 years falls below the standard Guidelines range of 48-66 months. N.T., 6/10/11, at 45. Additionally, given the violent and serious nature of Byrd's crimes, a consecutive sentence was not unduly harsh.

For these reasons, we decline to review Byrd's challenge to the discretionary aspects of his sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/23/2016

- 13 -