HIGHLAND SEWER AND WATER
AUTHORITY, Appellant

v.

FOREST HILLS MUNICIPAL
AUTHORITY.

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 2002.

April 10, 2002.

Richard R. Wilson, Altoona, for appellant.

Patricia A. Monahan, Pittsburgh, for appellee.

Before: FRIEDMAN, Judge, LEADBETTER, Judge, and FLAHERTY, Senior Judge.

Opinion by Senior Judge FLAHERTY.

Highland Sewer and Water Authority (Highland) appeals from an order of the Court of Common Pleas of Cambria County (trial court) which sustained the preliminary objections filed by Forest Hills Municipal Authority (FHMA) in the nature of a demurrer and dismissed Highland's complaint. The trial court also denied Highland's request for reconsideration. We affirm in part and reverse in part.

Highland is a municipal authority which provides water and sanitary sewer services to over 9,000 customers in 19 municipalities including Richland Township. FHMA is a municipal authority, which provides sanitary sewer services to approximately 3,000 customers in 8 municipalities adjacent to the Highland sewer service area.

Beginning in 1992, FHMA and Highland were interested in the construction and implementation of a sewer project to foster economic growth and development. FHMA obtained a contract with the U.S.

Army Corps of Engineers to construct a sewage treatment plant known as South Fork Plant. According to the complaint filed by Highland, Highland agreed to direct its future and existing sewage flows, which were then treated at a different sewage plant, to the new South Fork Plant. As originally proposed by Highland, the estimated project cost for "phase I" was $12 million.

In 1994, FHMA proposed an expanded system to serve new areas beyond Richland Township and the Highland service area. This expansion increased the cost of the sewage project to $38 million. On June 13, 1995, Highland issued a formal proposal to FHMA wherein it stated that its customers should only be assessed the costs directly attributable to servicing its area. The proposal contained a detailed formula and calculation of Highland's share of the project costs based on an "as built" formula. (Exhibit 27, R.R. 128.) On August 3, 1995 FHMA acknowledged receipt of the formal proposal. (Exhibit 28, R.R. 136.) Later in August, both Highland and FHMA appointed members to a committee to conduct discussions and negotiations regarding the cost and construction of the proposed facilities. (Exhibits 29 and 30, R.R. 138, 139.) Another meeting occurred between Highland and FHMA on September 11, 1996 whereby "[b]oth parties agreed to permit their respective Manager to continue negotiations geared toward finalizing the aforementioned financial computation for those facilities to be acquired by Highland. . . ." (Exhibit 31, R.R. 140.) The parties thereafter continued to meet and discuss the sewer project.

On January 20, 1998 the parties entered into a memorandum of understanding. The memorandum stated that the parties had agreed upon completion of a regional sewer project and that Highland would acquire those facilities constructed within Richland Township. Moreover, acquisition by Highland would be by means of a lease/purchase agreement "to be negotiated between the parties". It further provided that the lease/purchase agreement would "fully detail the relationship between the parties and shall set forth the formula or calculations by which the respective debt and respective payments of Highland and Forest Hills are to be determined." (Exhibit 38, R.R. 160.)

On May 14, 1998 at a joint FHMA/Highland subcommittee meeting, FHMA director (Sivic) reported that he and Highland manager (Englehart) had met about the proposed lease/purchase agreement and agreed in principle on the methods for cost sharing. (Exhibit 39, R.R. 161.) On May 22, 1998, the first draft of the lease purchase agreement containing the as built formula was prepared by Englehart and sent to Sivic for comments. (Exhibit 40, R.R. 164.) Sivic made changes to the agreement on July 21, 1998 and July 29, 1998, but the as built cost allocation method contained therein did not change.

Almost one year later on August 17, 1999, the chairman of Highland sent a letter to the chairman of FHMA reiterating that the parties had entered into a memorandum of understanding in January of 1998 with the desire to finalize a lease/purchase agreement between the parties which would fully outline their responsibilities. The letter stated that although the managers of FHMA and Highland had drafted a lease/purchase agreement "they haven't come to any final recommendation for approval by the respective Boards of FHMA & HSWA [Highland]." (Exhibit 47, R.R. 193.) The letter urged both sides to finalize the lease/purchase agreement so that new rate schedules could be prepared for customers. On February 10, 2000 members

of Highland and FHMA met in an attempt to finalize the lease/purchase agreement. At the meeting, FHMA for the first time proposed to take the total project costs and average it over the entire customer base in the joint sewer project area. Highland objected to this pro rata calculation stating that it has always been their intention to pay only for facilities constructed in its area. Further proposals generated by FHMA again proposed that costs be calculated on a pro rata basis. On April 6, 2000 the Highland chairman formally rejected a proposal by FHMA to utilize a pro rata cost formula.

Based on FHMA's refusal to use Highland's "as built" cost allocation formula, and its insistence that Highland pay for sewer facilities and treatment on a pro rata cost allocation based on all users served by the South Fork plant, Highland then refused to further direct its sewage flow to the new plant. Additionally, because Richland Township amended its Act 537 sewage disposal plan, which calls for sewage flow to be directed to the new plant, no further construction or occupancy permits can be issued in Richland Township.

Highland filed a complaint against FHMA maintaining that since the inception of the proposed sewage facility, Highland advised FHMA that its participation was based on a cost allocation that assigned to Highland only the "as built" costs associated with new facilities to be constructed in Richland Township and the cost of sewage transmission and treatment attributable to those sewage flows originating in the Highland service area and Richland Township. Highland maintains that FHMA never objected to the "as built" formula. Highland has alleged breach of an express contract (Count I), a contract implied in fact (Count II), a con-

tract implied at law (Count III) and in Count IV requested declaratory judgment.

FHMA filed preliminary objections in the nature of a demurrer to Counts I, II, and III. The trial court sustained FHMA's preliminary objections in an order dated April 10, 2001. At a hearing held April 16, 2001 on Highland's motion to compel responses to interrogatories and request for production of documents, the trial court advised Highland that it would not consider the motion to compel because its April 10, 2001 order had dismissed Highland's entire complaint. Counsel for Highland informed the trial court that preliminary objections had been only directed to Counts I through III. The court issued an amended order on April 16, 2001 dismissing "all counts" of the complaint. Thereafter on April 26, 2001, Highland filed a motion for reconsideration, which the trial court denied. This appeal followed.

■ In an appeal from an order sustaining preliminary objections in the nature of a demurrer, we are constrained to examine only those well-pleaded facts in the complaint, since a demurrer admits those facts and any inferences reasonably deducible therefrom, for such a determination. Dismissal of a complaint on preliminary objections should occur only in cases which are clear and free from doubt. *Easton Area Joint Sewer Authority v. Bushkill–Lower Lehigh Joint Sewer Authority*, 71 Pa.Cmwlth. 553, 455 A.2d 286 (1983).

Initially, we will address Count I wherein Highland alleged breach of an express contract. Specifically, Highland alleged that on September 11, 1996, FHMA delegated to its manager, (Sivic), and Highland delegated to its manager, (Englehart), responsibility to finalize the financial computations for cost allocation for the sewage facilities under a lease/purchase agreement. (Exhibit 31, R.R. 140.) Further, from January 1998 to August 1998, Sivic

and Englehart exchanged draft agreements, which contained the cost allocation method proposed by Highland and FHMA never made any objections, or revisions.[1] In May, 1998, Sivic advised the Highland FHMA subcommittee that he and Englehart agreed in principle on the method of cost sharing and the subcommittee directed the managers to prepare a final draft agreement. Highland argues that Sivic, as the authorized agent to negotiate matters on behalf of FHMA, contractually bound FHMA to the cost allocation formula contained in the finalized lease/purchase agreement. By refusing to execute the finalized lease/purchase agreement, Highland alleges that FHMA breached its agreement with Highland.

FHMA maintains that even though both parties delegated power to their managers to negotiate a lease/purchase agreement, contrary to Highland's assertion, no authority was given to them to enter into contractual obligations, such authority remained with the Board. Specifically, Exhibit 31 to Highland's complaint references a September 11, 1996 meeting between FHMA and Highland, which meeting minutes state in relevant part:

> Both parties agreed to permit their respective Manager to continue negotiations geared toward finalizing the aforementioned financial computation for those facilities to be acquired by Highland. .... *Any matter needing Board action will be taken back to the respective Boards.*

(Emphasis added.) In addition, pursuant to Section 4 of the Municipal Authorities Act of 1945(Act)[2], 53 P.S. § 306(j), only authorities have the power to make contracts. Furthermore, pursuant to Section 7 of the Act, 53 P.S. § 309(A), "[t]he power-

ers of each Authority shall be exercised by a governing body." There are no provisions under the Act which permit an employee to enter into a contract. In *Pittsburgh Baseball v. Stadium Authority,* 157 Pa.Cmwlth. 478, 630 A.2d 505 (1993) this court refused to enforce the mayor's promise to pay $4.2 million to the purchasers of the Pittsburgh Pirates even though the purchasers relied on the promise in purchasing the team. City council never took any action on the alleged contract and the court stated that persons contracting with a municipal corporation must at their peril inquire into the power of the corporation or its officers to make the contract or incur the debt.

Highland responds that it has asserted that both Sivic and Englehart were agents who had the authority to finalize the cost allocation formula to be used in the lease/purchase agreement and in accordance with *Easton* such allegations with respect to agency must be considered as admitted for purposes of preliminary objections and a cause of action alleging a breach of an express agreement between those agents cannot be dismissed. This case is distinguishable from *Easton,* however, because in this case there was a memorandum of understanding dated January 20, 1998, wherein the parties agreed to enter into a lease/purchase agreement in the future which would set forth the formula and calculations with respect to the debt and payments of Highland. Though the respective managers had the authority to negotiate the financial computations for the lease/purchase agreement, there was certainly no express contract as evidenced by the negotiated memorandum of understanding which stated that the parties still had to negotiate a lease/pur-

---

**1.** In fact, from the inception of the project in January of 1992, FHMA never opposed the "as built" cost allocation method.

**2.** Act of May 2, 1945, P.L. 382, *as amended.*

chase agreement. In *Easton,* there was no such memorandum of understanding. Moreover, the minutes of the September 11, 1995 meeting between Highland and FHMA, where both entities authorized their managers to negotiate the financial computations, also reveal that both FHMA and Highland intended further Board approval when they stated that "[a]ny matter needing Board action will be taken back to the respective Boards." (Exhibit 31, R.R. 140.)

■ The trial court concluded and FHMA argues that no contract can be implied if the parties have indicated an intention to agree upon essential terms in the future, *Upsal Street Realty Co. v. Rubin,* 326 Pa. 327, 192 A. 481 (1937), and the trial court did not err in dismissing Count I of Highland's complaint. "An agreement to agree is incapable of enforcement, especially when it is stipulated that the proposed compact shall be mutually agreeable." *Onyx Oils & Resins, Inc. v. Moss,* 367 Pa. 416, 419, 80 A.2d 815, 816 (1951). In this case, the parties entered into a memorandum of understanding on January 20, 1998 whereby they agreed that they would enter into a lease/purchase agreement that would "fully detail the relationship between the parties and shall set forth the formula or calculations by which the respective debt and respective payments of Highland and Forest Hills would be determined." (Exhibit 38, R.R. 160.) As such, because no lease/purchase agreement was ever entered into by the Boards of the Authorities, there was no express contract.

■ Next, we will address Count II of the Complaint wherein Highland alleged a contract implied in fact. A contract implied in fact is one where the parties assent to the formation of a contract, but instead of being expressed in words, the intention to infer obligation is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct. *Crawford's Auto Center v. Pennsylvania State Police,* 655 A.2d 1064 (Pa.Cmwlth.1995), *petition for allowance of appeal denied,* 542 Pa. 651, 666 A.2d 1059 (1995). In Count II of its Complaint, Highland alleged that by failing to make any objection or counterproposal to its cost allocation proposal, FHMA induced Highland to continue its participation in the sewage project, undertake the commitment of funds in connection with the financing of the project and to commit sewage flows to the new South Fork plant. Highland argues that it can be implied from the course of dealings that the parties agreed to use Highland's cost allocation formula in determining Highland's share of the debt service.

■ The trial court determined and FHMA argues that silence will not constitute acceptance of an offer in the absence of a duty to speak. *Chorba v. Davlisa Enterprises, Inc.,* 303 Pa.Super. 497, 450 A.2d 36 (1982). In this case, FHMA maintains that it did not have a duty to speak, nor has Highland alleged such a duty and as such FHMA's conduct did not amount to an acceptance of Highland's "as built" cost allocation formula. We observe, however, that FHMA did not merely remain silent. Rather, according to Highland's complaint and the exhibits attached thereto, which contain all the credible facts available at this preliminary stage, since the inception of the sewer project in 1992, Highland and FHMA have continued to negotiate for the construction of sewer facilities based on the "as built" formula proposed by Highland and no other formula was ever proposed by FHMA until the FHMA Board rejected the proposed lease/purchase agreement in 2000. The course of dealings between the parties during the five year period of negotiations,

whereby FHMA continued to negotiate the lease/purchase agreement based on an "as built" cost basis and other facts which would determine the assent to such calculation of FHMA cannot be ascertained from a record consisting entirely of a complaint and a demurrer. The truth will lie in the trial as to whether the parties here assented to a contract without expressing it formally in words alone but conducted themselves under circumstances from which the intention to infer obligation is inferred.

In 1994, FHMA proposed to expand their system. In 1995, Highland issued a formal proposal to join based on an "as built" cost assessment formula. Negotiators were appointed. In 1998, they entered into a memorandum of understanding to negotiate a lease purchase agreement. Six months later the first draft was completed with a debt and payment schedule. After some changes, Highland requested finalizing so new rate schedules could be prepared. When the parties met six months later, five years after they had been negotiating, FHMA introduced for the first time the concept of averaging total project costs over the entire customer base instead of the as built formula which had been originally proposed by Highland five years before. The key question is what conduct of FHMA, besides negotiating, was there from which its assent to a contract on an as built basis could be inferred? Highland alleges, and we are required to believe as true for this purpose, that FHMA induced it to participate in the sewage project and then, by its course of conduct in acquiescing in the "as built" formula during five years of negotiations further induced Highland to continue to participate in the sewage project, to undertake the commitment of funds to finance the project and to continue to connect sewage flows to the new

plant. As such, the trial court erred in dismissing Count II of Highland's complaint which stated a cause of action upon which relief could be granted.

■ Next, we will address Count III wherein Highland alleged a contract implied at law. A contract implied at law, also known as a quasi-contract, is not really a contract at all, but a fictional contract, which is a form of the remedy of restitution. *Crawford's Auto Center.* A contract implied at law imposes a duty, despite the absence of either an express or implied agreement, when one party receives an unjust enrichment at the expense of another party. *Department of Environmental Resources v. Winn,* 142 Pa.Cmwlth. 375, 597 A.2d 281 (1991), *petition for allowance of appeal denied,* 529 Pa. 654, 602 A.2d 863 (1992).

■ In Count III of its Complaint, Highland has alleged that which we are bound to accept as true that FHMA, by its acts and omissions, induced Highland to enter into the sewage project, to continue its participation in the project, commit resources and to commit future sewage flow to the new treatment plant. For seven years the parties utilized an "as built" formula. Even if FHMA never intended to utilize the "as built" cost basis in the lease purchase agreement, Highland alleges FHMA is estopped to deny the application of that formula because to do so would confer an unjust enrichment upon FHMA and penalize Highland in a manner which is inequitable.

The trial court dismissed Count III of Highland's complaint concluding that there was insufficient evidence to prove an implied contract at law. (Trial court opinion at p. 3.) However, we agree with Highland that Highland did not have to prove a contract in its pleadings but, rather, for purposes of preliminary objections, only

had to plead facts which, if proven at the trial, set forth a cause of action upon which relief could be granted. Here, Highland has alleged facts which infer that FHMA has received a benefit amounting to unjust enrichment inasmuch as Highland, in reliance on FHMA's course of conduct, has pledged sewage flows and future sewage flows to the new FHMA facility and has committed to either provide resources to the new facility or suffer the loss of all future construction and occupancy permits in Richland Township. Consequently, the trial court erred in granting the preliminary objections of FHMA.

In Count IV of its complaint, Highland incorporated by reference all of the facts alleged in the previous three counts and sought a declaratory judgment by the court that FHMA is contractually obligated to determine Highland's debt service and cost of facilities in accordance with Highland's cost allocation formula as stated in the lease/purchase agreement.

Although FHMA did not file preliminary objections with respect to Count IV, the trial court nonetheless dismissed the entire complaint.[3] Highland argues that because FHMA did not file any preliminary objections with respect to Count IV, it waived its right to challenge the legal sufficiency of Count IV at this stage of the proceedings under Pa. R.C.P. 1032. Rule 1032 provides that "[a] party waives all defenses and objections which are not presented either by preliminary objection, answer or reply. . . . ." FHMA argues, however, that nothing in Rule 1032 states that by not asserting preliminary objections against Count IV of the complaint for de-claratory relief, FHMA waived its right under the rule.

FHMA also responds that its preliminary objections were intended to be and were properly construed by the trial court as a motion for complete dismissal of the action. Additionally, the issuance of a declaratory judgement is a matter of judicial discretion which should only be exercised to illuminate an existing right, status or legal action. *Bromwell v. Michigan Mutual Insurance Co.*, 716 A.2d 667 (Pa.Super.1998). For declaratory relief to be appropriate there must be an actual controversy. *South Whitehall Township v. Department of Transportation*, 82 Pa. Cmwlth. 217, 475 A.2d 166 (1984). As evidenced by the trial court's dismissal of this action in accordance with the preliminary objections filed by FHMA, the trial court found that no actual controversy existed in this case. Without the presence of an actual controversy, declaratory relief is inappropriate and the trial court's dismissal of the entire complaint was within its discretion.

We conclude, however, that because FHMA did not file preliminary objections with respect to Count IV, it thereby waived any such objection in accordance with Rule 1032 and because the trial court did not address Count IV in its opinion and explain why it dismissed Count IV, we cannot, as FHMA argues, assume that the trial court determined that no case or controversy existed thereby warranting the dismissal of Count IV. As such, we reverse the trial court's dismissal of Count IV.

In accordance with the above, we reverse that portion of the trial court order which dismissed Count II, Count III and

---

**3.** Although the record clearly shows that no preliminary objections were filed to Count IV, counsel for FHMA continued to insist at the argument that the record contained specific objections to Count IV. A post argument review verified that a deliberate false statement had been made to the court because no specific preliminary objection was made to Count IV.

Count IV of Highland's complaint. The order of the trial court is affirmed in all other respects. This case is remanded to the trial court for further proceedings.

### ORDER

Now, April 10, 2002, the order of the Court of Common Pleas dated April 16, 2001 is reversed insofar as it dismissed Count II, Count III and Count IV of Highland's complaint and affirmed in all other respects. The case is remanded to the trial court for further proceedings.

Jurisdiction relinquished.