J-A01010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL J. DUCAS, WILD PINES ENTERPRISES, LLC., AND WILD PINES MANAGEMENT, INC | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : | |
| | : | No. 1160 EDA 2020 |
| PINECREST DEVELOPMENT CORP., | : : | |

Appeal from the Judgment Entered June 12, 2020
In the Court of Common Pleas of Monroe County Civil Division at No(s):
No. 2010-07014

BEFORE:   BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    Filed: May 6, 2021

Michael J. Ducas ("Ducas"), Wild Pines Enterprises, LLC ("WPE"), and Wild Pines Management, Inc., (collectively "Appellants"), appeal from the judgment entered on June 12, 2020, in favor of Appellee, Pinecrest Development Corp. ("PDC"), after a non-jury trial on Appellants' breach of contract and unjust enrichment action.[1]  After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Appellants purport to appeal from the April 29, 2020 order denying their motion for post-trial relief; however, an appeal properly lies from the entry of judgment following the trial court's disposition of post-trial motions.  **See Fanning v. Davne**, 795 A.2d 388 (Pa. Super. 2002).  Although Appellants' notice of appeal was filed prematurely in the instant matter, final judgment was entered on June 12, 2020; hence, the notice of appeal relates forward to that same date.  **See** Pa.R.A.P. 905(a)(5).  **See also Drum v. Shaul Equipment and Supply Co.**, 787 A.2d 1050, 1052 n.1 (Pa. Super. 2001)
*(Footnote Continued Next Page)*

J-A01010-21

The trial court provided the following summary of the relevant facts and procedural history in this matter:

[PDC] is the developer corporation of the Pinecrest Lake Development ("Pinecrest"), located at Sullivan Trail, Pocono Pines, Monroe County, Pennsylvania. Pinecrest was planned to consist of several sections, including: (a) the hotel parcel; (b) the middle section, comprising 441 lots (76 for townhomes, 365 for single family homes); (c) 24 Lake Villa lots; (d) 16 Boy Scouts lots; (e) [the] 200[-]acre nature preserve; (f) [the] golf course and golf course lots; (g) the cemetery; (h) the swim complex; and (i) the lake.[2]  [Appellants'] claim against [PDC] seeks the return of deposit monies paid to Edward Carroll[, president of PDC,] and the payment of monies allegedly loaned to [PDC] for the purpose of increased development.  [Appellants] commenced with their lawsuit on or about July 20, 2009, by the filing of their complaint in Lackawanna County, Pennsylvania.  The matter was transferred to Monroe County, Pennsylvania[,] for improper venue.

Edward Carroll [("Carroll")], at all times relevant, was the sole shareholder of [PDC] and its president.  Carroll has not been named as a defendant in this matter and was not called as a witness.  Nevertheless, a series of transactions between Carroll and … Ducas[] are at issue in this case.  In May of 2003, Ducas and Carroll entered into an agreement of sale ("First Stock Sale [Agreement]") for 1,000 shares of voting and 9,000 shares of non-voting stock in [PDC,] in exchange for the payment of … $1,500,000.00[].  [PDC] was not a party to this agreement. Ducas paid deposits in the sum of $255,000.00 to Carroll, but ultimately defaulted on the agreement.

On February 6, 2004, Ducas and Carroll entered into another stock agreement ("Second Stock Sale [Agreement]") for Carroll's same stock.  Although full payment had yet to be received, closing was held on February 13, 2004, at the law offices of Gregory Pascale,

(noting that entry of final judgment during the pendency of an appeal is sufficient to perfect appellate jurisdiction).

2 Ducas is the owner of WPE.  On July 26, 2002, WPE purchased Wild Pines Golf Club, LLC, located in Pinecrest, after the golf course was foreclosed upon. **See** N.T. Trial, 4/17/19, at 62-63; Plaintiffs' Exhibit 3, U.S. Marshal's Deed.

- 2 -

where Carroll transferred the stock to Attorney Pascale, who held the stock in escrow. From the closing up until default in or around October 2005, Ducas held himself out as [PDC] President, although he had no authority to do so.[3] In addition to the deposits previously paid, Ducas executed a promissory note for the remainder of the original agreed[-]upon price, the amount of … $1,355,000.00[,] payable in sixty days. On April 30, 2004, Carroll and Ducas entered into an extension of the February 13, 2004[] promissory note, acknowledging that Ducas … paid an additional … $337,090.00[,] and extending the deadline for final payment on the Second Stock Sale [Agreement] until June 30, 2004. The extension agreement provided that Ducas would pay all hotel costs and franchise application fees, and he agreed that "all deposit monies shall be kept by the seller if purchaser is not able to satisfy the obligation under the terms of the contract." Ultimately, Ducas defaulted on the agreement.

In October of 2004, Ducas, … Carroll[,] and Brendon … entered into a third agreement for the sale of [PDC] stock ("Third Stock Sale [Agreement]"), where Ducas agreed to purchase all outstanding shares of [PDC] stock in exchange for … $3,958,000.00[]. In this agreement, [PDC] was a limited party for a specific purpose. In furtherance of the agreement, Ducas paid … Carroll deposits totaling … $404,180.00[].

Pursuant to the Third Stock Sale [Agreement], in the event Ducas should default[,] the "seller shall retain his ownership of the stock together with all other consideration previously paid or pledged to the seller by the purchaser or corporation under this agreement…." Upon Ducas' default, [PDC] agreed to execute a non-interest bearing promissory note in the aggregate amount of … $1,536,000.00[]. Additionally, [PDC] agreed to pay Ducas the unreimbursed amounts he expended for the development of Pinecrest subdivision and hotel site, not to exceed … $191,093.63 ("Ducas Incremental Payoff"), and [to] grant a mortgage upon the middle section of lots, as security for repayment of the promissory

---

[3] Brendon Carroll ("Brendon"), at all relevant times, held the positions of vice president and chief operating officer of PDC. Brendon testified that he has been managing PDC's day-to-day operations since 1994, and that Ducas did *not* take over PDC's operations in 2004. Moreover, during the period of 2003-2005, Brendon stated that Ducas did *not* hold the title of PDC's president, nor did he authorize Ducas to enter into any contracts on PDC's behalf. N.T. Trial, 4/26/19, at 6-7, 13-15, 20-21.

note, payable to Ducas at the closing on the sale of each lot in payments of … $3,614.12[] per lot, plus an incremental sum equal to the Ducas Incremental Payoff divided by … 425[]. Ducas was unable to complete his obligations and responsibilities pursuant to the Third Stock Sale [Agreement] because Sovereign Bank refused to loan him money, which it had previously agreed to lend. Ducas did not make a demand of [PDC] for the note or mortgage provided [for] under the Third Stock Sale Agreement.

Prior to entering into the Third Stock Sale Agreement, while Ducas held himself out to be President of [PDC], he expended monies for the development of Pinecrest and the hotel site. Although he had no corporate authority to do so, Ducas entered into a licensing agreement with Hawthorn Suites Gold Resort on July 7, 2004. However, he placed the franchise in the name of his sister, not in [PDC's] name.[4] Then[,] in August of 2004, Ducas—again[,] with no corporate authority to do so—entered into an agreement of sale with Westminster for certain lots in Pinecrest.[5] The Westminster contract required additional engineering work, which required the expenditure of additional monies. In total[,] Ducas spent … $362,394.63[,] in anticipation of [PDC's] acquiring the benefits from the Hawthorn and Westminster contracts. He then spent an additional … $79,000[] procuring the franchise from Hawthorn after the Third Stock Sale did not close. Ducas possesses no note, loan agreement[,] or other agreement evidencing a loan with [PDC].

In addition to the amounts expended by Ducas for development of the Pinecrest subdivision and hotel[,] Ducas also expended … $151,700.00[] for [PDC's] operational expenses. This money was paid to Pinecrest Lake Companies, Inc.[6] However, there is no

---

[4] Ducas testified that the licensing agreement was between Hawthorn Suites and PDC for the purpose of building a Hawthorn Suites hotel in Pinecrest. The license was placed in his sister's name, however, as she was going to be the president of the hotel. The hotel was never built. *See* N.T. Trial, 4/17/19, at 61-62.

[5] We glean from the record that Westminster is a subsidiary of Pinecrest Lake Companies, Inc., discussed *infra*.

[6] Pinecrest Lake Companies, Inc., is a separate and distinct corporate entity from PDC and is wholly owned by Brendon Carroll. *See* N.T. Trial, 4/17/19, at 156; N.T. Trial, 4/26/19, at 10-11.

evidence [that] Pinecrest Lake Companies, Inc., paid any money to [PDC]. Additionally, compensation for operating expenses of [PDC] are not referenced in any of the agreements executed by Ducas.

On December 22, 2005, [Appellants] entered into an agreement of sale with [PDC] ("Final Agreement"), where [PDC] was to purchase [Appellants'] golf course operations[, Wild Pines Golf Club,] in exchange for payment of … $12,000,000.00[]. On or about March 31, 2008, the parties terminated their agreement ("Termination of Final Agreement"). The termination agreement provided that "this termination shall not relieve buyer's obligation to repay Michael J. Ducas any monies owed." At the time of execution, Carroll, on behalf of [PDC], and Ducas agreed the amount owed was "to be determined." However, no determination was ever made by the parties.

After Sovereign Bank refused to close on the financing of Ducas' acquisition of [PDC], Ducas and Ducas Enterprises, LLC[,] filed a breach of contract action against Sovereign, seeking in excess of … $20,000,000.00[] in damages. Ducas and Ducas Enterprises, LLC, received a gross settlement from Sovereign Bank in the amount of … $3,000,000.00[].

Trial Court Opinion ("TCO I"), 12/30/19, at 2-6 (unnecessary capitalization omitted).

Instantly, Appellants filed a complaint alleging breach of contract or, in the alternative, unjust enrichment against PDC, in which they seek the return of deposit monies paid to Carroll totaling $404,180.00, as well as repayment of monies allegedly loaned to PDC for development and operational costs totaling $411,394.63. PDC filed an answer and new matter, which it subsequently amended. After the court's granting of several continuances, a two-day, non-jury trial was held on April 17 and 26, 2019. At trial, Appellants presented Ducas and Attorney Pascale as witnesses, and Brendon testified for PDC. The trial court took the matter under advisement and, after careful

- 5 -

consideration of the testimony and evidence presented, it issued an order dated December 12, 2019, finding in favor of PDC and against Appellants. Appellants subsequently filed a motion for post-trial relief,[7] which was denied by the court. On June 12, 2020, after Appellants' filing of a praecipe with the prothonotary, judgment was entered in accordance with the December 12, 2019 decision.

On May 18, 2020, Appellants filed a notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellants now present the following issues for our review:

A. Whether the learned trial judge erred when she concluded that the [Third Stock Sale A]greement … dated October 1, 2004[,] and the [T]ermination [of Final A]greement dated March 31, 2008[,] did not provide for reimbursement of monies paid by Ducas in the event that Ducas was unable to obtain financing?

B. Whether the learned trial judge erred in concluding that [PDC] was not required to reimburse Ducas for monies expended for [its] operating expenses and the development of Pinecrest?

C. Whether the learned trial judge erred when it concluded that [PDC] was not unjustly enriched by monies spent by Ducas on its behalf?

_____

[7] The trial court found Appellants' motion to be "technically untimely," but elected to address the merits in the interest of "fairness and substantial justice," as it determined a mere single-day delay would not cause undue prejudice to PDC, and PDC failed to properly object to the untimely filing. Trial Court Opinion ("TCO II"), 4/30/20, at 2 (citing Pa.R.C.P. 227.1(c)(2); **Arches Condominium Ass'n v. Robinson**, 131 A.3d 122 (Pa. Cmwlth. Ct. 2015) (recognizing that Rule 227.1(c)(2) is not jurisdictional in nature, but merely procedural); **Caldwell v. City of Philadelphia**, 517 A.2d 1296 (Pa. Super. 1986) (stating the court has the discretion to determine an untimely post-trial motion, absent objection and prejudice to the opposing party)).

Appellants' Brief at 5.

We apply the following standard of review to a non-jury trial verdict:

> Our appellate role in cases arising from non[-]jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.
>
> The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.
>
> *Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 60-61 (Pa. Super. 2012) (citation and quotation marks omitted; brackets and ellipses in original). The trial court, as the finder of fact, is free to believe "all, part or none of the evidence presented." *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super. 2006) (citation omitted). "Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder." *Id.* (citation and internal quotation marks omitted).

*Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.*, 181 A.3d 1188, 1191-92 (Pa. Super. 2018).

Preliminarily, Appellants explain that their claim is broken down into two parts: (1) seeking reimbursement of deposits in the amount of $404,180.00;[8] and (2) seeking reimbursement of monies loaned to PDC for operating expenses and for the development of its subdivision and hotel, totaling $411,394.63.[9] Appellants' Brief at 17. Their breach of contract claim is based on paragraph 2.5 of the Third Stock Sale Agreement, which they allege provides for reimbursement to Ducas for deposit monies paid, as well as for monies he expended for the development and operation of PDC. Paragraph 2.5 states, in relevant part:

In the event the Sovereign secondary closing does not occur on or before November 30, 2004[,] and the cash payments as required by subparagraphs 2(b) and (c) have not been timely made in full on or before November 30, 2004, then (i) [the s]eller shall retain his ownership of the stock together with all other consideration previously paid or pledged to the seller by the purchaser or corporation under this agreement, and (ii) the seller and corporation shall be relieved of all obligations under this agreement, except that the corporation shall execute a non-

_____

[8] The record reflects that Ducas paid the following deposits to PDC: $15,000.00 on 5/01/2003; $40,000.00 and $100,000.00 on 6/30/2003; $100,000.00 on 7/01/2003; and $107,000.00 on 10/01/2004. Ducas also made one payment to Titan Custom Homes in the amount of $42,180.00 on 2/20/2004. These payments total $404,180.00. *See* Plaintiffs' Exhibits 23-29. *See also* N.T. Trial, 4/17/19, at 77-78 (Ducas' testifying that the check made payable to Titan Custom Homes was a deposit he made on behalf of Carroll for a home that Carroll was purchasing in Florida, and that the deposit was intended to be credited towards Ducas' purchase of PDC).

[9] Appellants presented documentation at trial reflecting a total of $386,388.00 in payments, which Ducas claims to have made directly to PDC for its operational expenses, as well as payments totaling $25,006.00, purportedly made on behalf of PDC for the development of Pinecrest and the hotel. *See* Plaintiffs' Exhibits 9-22, 30-35.

interest bearing promissory note (the "Ducas Note") in the aggregate amount of $1,536,000 (the "Ducas Payoff") plus unreimbursed amounts expended by [the] purchaser for development of the Pinecrest subdivision and hotel site[,] not to exceed $191,093.63 ("Ducas Incremental Payoff")[,] and grant a mortgage (the "Ducas Mortgage") as security for repayment of the Ducas Note upon the middle section…[,] payable to the purchaser at the closing on the sale of each lot in payments of … $3,614.12[] per lot[,] plus an incremental sum equal to the Ducas Incremental Payoff divided by 425 (the "Ducas Lot Release Price").

*Id.* at 21-22 (quoting Plaintiffs' Exhibit 5, Third Stock Sale Agreement, at 2

¶2.5) (unnecessary capitalization omitted).

Appellants further aver that PDC confirmed its agreement to reimburse

Ducas in paragraph 4 of the Termination of Final Agreement, which provides:

4. Notwithstanding anything in this agreement to the contrary set forth herein, this termination shall not relieve [PDC's] obligation to pay Michael J. Ducas any monies owed to Michael J. Ducas by PDC[.] To be determined.

*Id.* at 22 (quoting Plaintiffs' Exhibit 7, Termination of Final Agreement ¶4

(single page)).[10] Appellants state that the amount "to be determined" was

intended to include deposit monies, as well as operational expenditures and

monies paid to third parties on behalf of PDC. *Id.* at 23 (citing N.T. Trial,

4/17/19, at 91). As the trial court discerned, however, no such determination

of an amount owed was ever made by the parties. TCO I at 6.

We now turn to the merits of Appellants' first two issues, which we

address together herein for ease of disposition. First, Appellants assert that

_____

[10] We note that the words "to be determined" were not included in the original, typed draft of the termination agreement but, rather, are handwritten in the margin of the document, adjacent to paragraph 4, and appear to be initialed by Carroll and Ducas. *See id.*

the trial court erred in finding that the Third Stock Sale Agreement did not provide for reimbursement of the deposit monies paid by Ducas, in the event he was unable to obtain financing. Appellants' Brief at 20. They contend that the purpose of paragraph 2.5 was to provide for repayment by Carroll to Ducas over a period of time, and that PDC would secure the repayment with a mortgage. *Id.* at 22 (citing N.T. Trial, 4/17/19, at 36) (referencing Attorney Pascale's testimony regarding the terms of paragraph 2.5). They further allege that the repayment terms of paragraph 2.5 include the reimbursement of deposit monies. *Id.* at 24-25 (citing N.T. Trial, 4/17/19, at 79) (noting Ducas' testimony that the Third Stock Sale Agreement between Ducas and Carroll would carry forward $336,000 in deposits previously paid by Ducas). *See also id.* at 26 (citing Plaintiffs' Exhibit 29) (indicating an additional deposit made by Ducas on October 1, 2004, in the amount of $107,000).

We observe, however, that in support of their claim, Appellants merely point to contradictory and self-serving testimony. They fail to include any legal analysis and are essentially asking this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder, which we cannot and will not do. *See Commonwealth v. Rodriguez*, 141 A.3d 523, 525 (Pa. Super. 2016). Thus, to the extent Appellants contest the trial court's finding that paragraph 2.5 of the Third Stock Sale Agreement did not provide for the reimbursement of Ducas' deposit monies, we deem this issue waived. *See* Pa.R.A.P. 2119(b).

Nevertheless, even if Appellants' claim was not waived, we would conclude that this issue lacks merit. As the trial court so aptly opined:

[W]e find that the claimed deposit money damages, amounting to … $404,180.00[], are not recoverable in this action. According to **Thompson v. Peck**, [181 A. 597 (Pa. 1936),] only a person against whom a cause of action exists can be liable or sued therefor. [**Id.** at 598.] The attempted transactions resulting in [Appellants'] alleged damages occurred during the years 2003-2005, and are based on three agreements, two of which were solely executed between … Ducas and … Carroll, a non-party. [Appellants] have presented no credible evidence that the deposit monies from these two agreements were utilized by or on behalf of [PDC], nor have they presented credible evidence that [PDC] was a party to these transactions, that … Carroll and [PDC] acted in concert as one and the same entity, thus breaching the corporate veil,[11] nor that [PDC] assumed any liabilities or obligations to pay money damages on Carroll's behalf. In fact, [Appellants'] sole possible argument to claim the deposit fund is through the interpretation of the contractual language presented in the Third Stock Sale [Agreement].

When a contractual interpretation arises from a disputed term among the parties, the court may interpret such language as a matter of law. **Pops PCE TT, LP v. R&R Restaurant Group, LLC.**, … 208 A.3d 79 ([Pa. Super.] 2019). The primary goal of contractual interpretation is to effectuate the intent of the parties. **Driscoll v. Arena**, … 213 A.3d 253, 259 ([Pa. Super.] 2019) (citing **N.E.A. Cross, Inc. Nat'l Fuel Gas Supply Corp.**, … 600 A.2d 228, 229 ([Pa. Super.] 1991), *appeal denied*, … 608 A.2d 31 (Pa. 1992)[)]. However, where contractual language is "[c]lear and unequivocal, its meaning must be determined by its contents alone." **Id.** According to **Shepard v. Temple Univ.**, [948 A.2d 852 (Pa. Super. 2008),] "[a] contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." [**Id.** at 857] (citing **Murphy v. Duquesne University**, … 777 A.2d 418, 429-30 [(Pa. 2001))]. Looking at the contractual language in the Third Stock

---

[11] "[A] corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." **Lumax Industries, Inc. v. Aultman**, 669 A.2d 893, 895 (Pa. 1995).

Sale [Agreement], we find the parties' intent is unambiguous[;] thus[,] we effectuate the parties' intent by reading the contract in its clear and plain language.

The Third Stock Sale [Agreement] attempted a global agreement between … Carroll, Brendon … (sellers), and Ducas (buyer), with [PDC] included in merely a limited capacity…. [*See* Plaintiffs' Exhibit 5.] Looking at the plain language of the contract, we find that the [Third Stock Sale Agreement], upon [Ducas'] default, requires [PDC] to execute a promissory note in the sum of … $1,536[,000], as well as pay out "unreimbursed amounts expended by [the] purchaser for the development of Pinecrest" not to exceed … $191,093.63[]. [*Id.* at 2 ¶2.5 (unnecessary capitalization omitted).] However, the plain language of the contract does not incorporate into that sum deposit monies paid by Ducas to Carroll. Rather, the parties only discuss reimbursement for expenditures related to the development of the Pinecrest subdivision and hotel site. In fact, the Third Stock Sale [Agreement] explicitly states, contrary to [Appellants'] argument, that the deposit monies shall be retained by Carroll: "In the event the Sovereign secondary closing does not occur on or before November 30, 2004 … [the] seller shall retain … *all other consideration previously paid or pledged to the seller by the purchaser*…." *Id.* [(brackets and unnecessary capitalization omitted; emphasis added by the trial court)].

We find that [Appellants] are not entitled to recover the deposit money damages claimed in the amount of … $404,180.00[]. [Appellants] have presented no credible evidence to show that [PDC] ever assumed any of … Carroll's alleged debts, and … Carroll is not a party to this lawsuit. Furthermore, the one contract presented to this [c]ourt, in which … Carroll and … Ducas and [PDC] are all parties, explicitly excludes the Ducas deposits from other possible reimbursements to Ducas made by [PDC]. Therefore, for reasons of lack [of] due process to … Carroll, we cannot and will not determine whether he is entitled to the Ducas deposits. However, we do find that for the reasons detailed above, the claimed money damages related to the deposits between Ducas and Carroll may not be recovered by [Appellants] through breach of contract….

TCO I at 7-10. We would deem the trial court's findings to be well-supported by the record, and we would discern no error of law.

Next, Appellants claim the trial court erred in finding that PDC's failure to reimburse Ducas for monies that he paid "on behalf of [PDC] for expenses related to its operations and the development of its subdivision and hotel[,]" did not constitute a breach of the Third Stock Sale Agreement. Appellants' Brief at 28. They contend that such expenditures were clearly intended as a loan to be repaid under the terms of the Third Stock Sale Agreement, and that paragraph 2.5 specifically provided for such repayment. *Id.* at 29-30. In support of their argument, Appellants rely on a series of checks, which they allege establish that Ducas made payments totaling $197,138.63, for the development of the Pinecrest subdivision and hotel site, and that he "loaned" PDC $214,256.00, to pay its operating expenses. *Id.* *See also* Plaintiffs' Exhibits 9-22, 30-35. Appellants claims are wholly without merit.

Additionally, Appellants argue that the trial court's decision is based on the erroneous finding that Ducas assumed control of PDC for a period of time without authorization to do so. Appellants' Brief at 30. To the contrary, they contend that Ducas was authorized to act on behalf of PDC with regard to the development of the Pinecrest subdivision and hotel site; however, their argument is merely supported by contradictory, self-serving testimony. *See id.* at 30-31 (citing N.T. Trial 4/17/19, at 27, 70-71 (referencing Attorney Pascale's and Ducas' testimony that Ducas was the sole shareholder and president of PDC for several months, beginning on February 13, 2004)). Thus, to the extent Appellants claim the trial court erred in finding Ducas was not authorized to enter agreements on behalf of PDC, we deem this issue to be

- 13 -

waived. **See Rodriguez**, 141 A.3d at 525 (recognizing that we cannot and will not re-weigh the evidence and substitute our judgment for that of the fact-finder).

The trial court provided the following detailed explanation of its findings in favor of PDC regarding Appellants' claim for reimbursement of operational expenditures and monies purportedly loaned to PDC in furtherance of its development:

> We now turn to [Appellants'] second claim for money damages in the amount of … $411,394.63[], which … Ducas claims he loaned to [PDC]. Although … Ducas alleges the payments he made to [PDC] were merely a loan, [Appellants] have presented no credible evidence to substantiate that claim though [*sic*] the presentation of loan documents, terms of interest, notes, checks indicating a loan, etc. Nevertheless, [Appellants] argue that according to contractual language in the Third Stock Sale [Agreement], read in concert with the Termination of Final Sale, … Ducas is entitled to be reimbursed for any monies expended and unreimbursed in the development of the Pinecrest subdivision and hotel. For the following reasons, we disagree.
>
> It has been recognized that a breach of contract is a non-performance of any contractual duty of immediate performance or the violation of an obligation, engagement[,] or duty. **See Johnson v. Fenestra, Inc.**, 305 F.2d 179 (3[d] Cir. 1962). In this matter[, Appellants] allege [PDC] breached the Third Stock Sale [Agreement] and Termination of Final Sale, by failing to reimburse … Ducas for loans made in furtherance of the development of [the] Pinecrest subdivision and hotel. To sustain such an allegation, [Appellants] are required to prove the four elements for breach of contract: (1) the existence of a contract between [the p]laintiff and [the d]efendant, (2) the essential terms of the contract, (3) the breach of a duty imposed by the contract, and (4) the damages resulting from the breach. **Mancini v. Morrow**, … 458 A.2d 580 ([Pa. Super.] 1983). Additionally, although a civil action for money lent can be brought, it is [the p]laintiff's burden to prove by a preponderance of the evidence that a loan was made and not repaid. **Lee v. Potter**, …

- 14 -

251 A.2d 697 ([Pa. Super.] 1969). We find [Appellants] failed to meet their burden that the payments made by … Ducas were intended as a loan to be repaid under the terms of the contracts.

First[,] we … acknowledge that the Third Stock Sale [Agreement] states, that upon default, [PDC] would pay Ducas "unreimbursed amounts expended by [him] for development of [the] Pinecrest subdivision and hotel site[,] not to exceed $191,093.63 ([`]Ducas Incremental Payoff[']). " … As we previously addressed…, we find that the language of this provision of the Third Stock Sale [Agreement] is clear and unambiguous…. Therefore, we use the plain language of the contract to effectuate the intent of the parties.

We note that according to a plain reading of the … clause [cited] above, … Ducas is entitled to less than half of the damages he is seeking. Following this agreement, [Appellants] have presented no credible evidence that Ducas would ever be entitled to more than … $191,093.63[]. For that reason, we find [Appellants'] possible damages are capped at that contractually[-]stated amount.

However, even assuming the cap on damages, we find [Appellants] are not entitled to the money they seek, as the investments … Ducas undertook fell outside the scope of the "development of Pinecrest subdivision and hotel site" as required under the contract. First…, in paragraph 2.5 of the Third Stock Sale [Agreement], … the parties imagined Ducas would be reimbursed for money related to [the] Pinecrest subdivision and hotel site development[. T]hey made no mention of operating expenses. Furthermore, [Appellants] have provided this court with no credible evidence showing that the money Ducas allegedly paid to Pinecrest Lake Community was ever used to benefit [PDC]. For these reasons, the damages claimed by Ducas involving alleged operational cost damages cannot be considered by this court from a breach of contract … standpoint.

Second, [PDC] has produced credible evidence that the remaining damages sought by [Appellants] involving payments by Ducas were made without corporate authority and for his own benefit,

outside of the contract.[12]  As such[,] the payments were not made for the "development of [the] Pinecrest subdivision and hotel site," but rather for Ducas' own purpose.  We find that given the lack of evidence that Ducas ever initiated a loan with [PDC], and evidence revealing his personal gain from investing in the unauthorized corporate transactions involving Hawthorn Suites Golf Resort and Westminster, [Appellees] are not entitled to recover the money Ducas expended through the means of breach of contract….

As indicated above, although Ducas was at the time a certified public accountant and knowledgeable in business affairs, he failed to produce any evidence of a loan agreement, interest or repayment terms, or even notations on his checks to substantiate his claim.  Once again, we reiterate that it is the plaintiff's burden to prove by a preponderance of the evidence that a loan was made and not repaid.  *Lee*…, … 251 A.2d [at] 697….  In this case, the vast majority of the checks were issued by Ducas[,] during the time in which he was attempting to purchase the controlling stock in Pinecrest.  We find this evidence compelling[] and revealing of Ducas' intent to invest in his business, so as to profit from the benefits of the franchise he set up with Hawthorn Suites Gold Resort and [the] sales agreement he executed with Westminster, not intended as a loan to be repaid.  In fact, the issue of a loan was not brought up until Ducas realized he would be unable to purchase the controlling share in Pinecrest he desired.  Although [Appellants] attempt to use the contractual language from the Third Stock Sale [Agreement] and the Termination of Final [Agreement] to indicate the acknowledgment of a loan, we are not convinced.

Furthermore, the unauthorized nature of the transactions that … Ducas undertook when he was acting as [PDC's] president, although he did not possess the corporate authority to do so, coupled with contractual evidence that Ducas was pursuing such risk personally, reveals to this court that expenses related to the franchise agreement with Hawthorn Suites Golf Resort and Westminster fell outside the parties' reimbursement clause in the Third Stock Sale [Agreement].  According to the April 30, 2004[]

_____

[12]  On cross-examination, Ducas admitted that he intended to use the agreement of sale between PDC and Westminster as part of the collateral for his Sovereign loan, which he needed in order to close on his deal with Carroll for the purchase of the PDC stock.  N.T. Trial, 4/17/19, at 101-02.

extension of the Second Stock Sale [Agreement] between Ducas and Carroll, Ducas agreed to pay all franchise application fees and all other fees associated with the hotel. In furtherance of that agreement, when Ducas did begin [the] application with Hawthorn Suites Golf Resort, he [named] his sister, not [PDC,] as the franchise owner. We find such evidence reveals that the investment Ducas expended into the Hawthorn Suites Golf Resort was that of a personal nature, and fell outside the subsequently written Third Stock Sale [Agreement] reimbursement clause. For these reasons, [Appellants] are not entitled to reimbursement for money expended toward the acquisition of a franchise with Hawthorn Suites Golf Resort.

Similarly, Ducas engaged in an unauthorized sale agreement with Westminster for personal benefit. According to Ducas' testimony, under the agreement, he was responsible to pay for engineering fees to obtain the approvals necessary to create and finalize the lots in Pinecrest that were to be conveyed. We find that this was not a loan, but [an] investment expenditure to move forward with his anticipation of acquiring [PDC's] stock and financially benefitting from the sale to Westminster.

TCO I at 10-14 (unnecessary capitalization and citation to record omitted). We deem the trial court's findings to be supported by the record, and we discern no error of law.

In addition to Appellants' reliance on the Third Stock Sale Agreement, they also claim the trial court erred in finding PDC was not obligated by the Termination of Final Agreement to repay any monies to Ducas. They attack the trial court's conclusion, as a matter of law, that the Termination of Final Agreement was not a valid, enforceable agreement. Appellants' Brief at 26. Specifically, Appellants argue that the trial court erred in characterizing the provision in paragraph 4 regarding repaying Ducas as a mere "agreement to agree." *Id.* We remain unconvinced that the trial court's decision should be overturned.

The court concisely explained its reasoning for finding that Appellants' claims are not separately recoverable through the clause at issue in the Termination of Final Agreement:

> [Appellants] are unable to sustain their burden of proving the existence of an enforceable contractual clause in the Termination of Final Agreement, where [the] parties never reached a meeting of the minds. In order to succeed in a breach of contract action, [Appellants] must first prove by a preponderance of the evidence the existence of the contract that [PDC] allegedly breached. *See Mancini* … 458 A.2d at 580…. To form a contract, "there must be a 'meeting of the minds,' whereby both parties mutually assent to the same things, as evidenced by an offer and its acceptance." *Mountain Properties, Inc. v. Tyler Hill Realty Corp.*, … 767 A.2d 1096, 1101 ([Pa. Super.] 2001) (citing *Schreiber v. Olan Mills*, … 627 A.2d 806, 808 ([Pa. Super.] 1993)). The parties in this case executed the Termination of Final Agreement on March 31, 2008, which stated in part that "this Termination shall not relieve Buyer's obligation to repay Michael J. Ducas any monies owed." However, at the time of execution, … Carroll, corporate officer on behalf of [PDC], and Ducas amended the language to include that the amount owed was "to be determined." Both initialed the handwritten change, signifying acceptance. No agreement was ever reached as to what monetary obligation, if any, was owed to … Ducas.
>
> While we recognize it may at first appear that the parties formed a contract—there is evidence the parties negotiated the clause at issue, came to an agreement, and accepted that agreement by initialing the handwritten change of terms—the clause upon which [Appellants] rely in the Termination of Final Agreement is ultimately nothing more than an agreement to agree. "An agreement to agree is incapable of enforcement…." *Highland Sewer & Water Auth. v. Forest Hills Mun. Auth.*, 797 A.2d 385, 390 (Pa. C[mwlth]. 2002) (quoting *Onyx Oils & Resins, Inc. v. Moss*, … 80 A.2d 815, 816 ([Pa.] 1951)). Under such circumstances, it is not for the court to imply contractual terms. *See Highland Sewer & Water Auth.*, 797 A.2d at 390 (citing *Upsal Street Realty Co. v. Rubin*, … 192 A. 481 ([Pa.] 1937)[)]. We find that because the parties in the instant case refrained from providing essential contractual terms, and instead merely

indicated a desire to determine possible monies owed in the future, the clause at issue is unenforceable.

TCO II at 12-13. We discern no abuse of discretion or error of law.

Moreover, we note that Appellants blatantly misconstrue the court's holding. The trial court did not deem the entire Termination of Final Agreement to be unenforceable but, rather, it held that "*the clause* upon which [Appellants] rely *in* the Termination of Final Agreement is … nothing more than an agreement to agree." TCO II at 13 (emphasis added). Generally,

> [a]n agreement is an enforceable contract wherein the parties intended to conclude a binding agreement and the essential terms of that agreement are certain enough to provide the basis for providing an appropriate remedy. If the essential terms of the agreement are so uncertain that there is no basis for determining whether the agreement has been kept or broken, there is not an enforceable contract.

*Linnet v. Hitchcock*, 471 A.2d 537, 540 (Pa. Super. 1984) (citations omitted). *See also* Restatement (Second) of Contracts § 33, comments a, b.

Here, the Termination of Final Sale Agreement was entered between Appellants and PDC for the purpose of terminating the Final Agreement regarding PDC's purchase of Appellants' Golf Course. Paragraph 4 simply provides that the termination shall not relieve PDC of its obligation to reimburse Ducas for any monies it owes him, and the handwritten notation indicates that the parties agreed the amount owed is "to be determined." The relevant clause lacks, however, the essential terms of a contract by which this Court could determine whether a breach of that contract has occurred. *See Linnet*, 471 A.2d at 540. There is no specification as to what type of payments are to be included in the calculation of the amount owed, the time

frame during which any such reimbursement shall be made, or the manner in which the monies are to be repaid. We agree with the trial court that the clause at issue is nothing more than an agreement to determine possible monies owed to Ducas in the future. Accordingly, we uphold the trial court's decision that Appellants' claims for reimbursement for monies expended by Ducas are not recoverable via a claim of breach of the Termination of Final Agreement.

Finally, Appellants argue that the trial court erred in finding that they failed to establish unjust enrichment. They specifically attack the court's conclusion that monies paid by Ducas were made without corporate authority. Appellants' Brief at 18, 33. They counter that Ducas was, in fact, authorized to act on PDC's behalf, relying solely on the testimony of Ducas and Attorney Pascale. *Id.* at 35. Additionally, Appellants attack the trial court's determination that the monies expended by Ducas were for his own benefit. They claim that a benefit was clearly conferred upon PDC by virtue of the monies expended on its behalf for operating expenses and the development of its property, and that if Ducas had not expended monies to maintain PDC's operations when it did not have sufficient cash flow, PDC would have had to cease operations. *Id.* at 18-19. In support of their argument, Appellants merely point to Ducas' testimony and copies of checks, which they contend represent payments made to PDC solely for its benefit—not for Ducas' benefit. *Id.* at 35. They conclude that the trial court "totally ignored the overwhelming evidence presented at trial[,]" in reaching its decision, and that it would be

- 20 -

inequitable for PDC to retain these benefits without repaying Ducas. ***Id.*** at 18-19, 36.

We observe that Appellants include little legal analysis in support of their claims. Instead, they primarily endeavor to dispute the trial court's findings of fact, pointing to contradictory and self-serving testimony. ***See id.*** at 33-36. Again, Appellants fail to appreciate that this Court cannot re-weigh evidence and substitute its judgment for that of the fact-finder. ***See Gamesa Energy USA***, 181 A.3d at 1192. ***See also Gutteridge v. J3 Energy Group, Inc.***, 165 A.3d 908, 914 (Pa. Super. 2017) (stating that this Court will respect a trial court's findings with regard to the credibility and weight of the evidence "unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious[,] or flagrantly contrary to the evidence") (quoting ***J.J. DeLuca Co. v. Toll Naval Associates***, 56 A.3d 402, 410 (Pa. Super. 2012)). "The test is not whether this Court would have reached the same result on the evidence presented[] but[,] rather, after due consideration of the evidence the trial court found credible, whether the trial court could have reasonably reached its conclusion." ***Gutteridge***, 165 A.3d at 916. We deem the trial court's finding in favor of PDC regarding Appellants' unjust enrichment claim to be clearly supported by the evidence that the trial court found credible.[13]

---

[13] The trial court expressly found Ducas' testimony lacked all credibility. ***See*** TCO II at 9.

The trial court opined:

Throughout the instant action, [Appellants] have misunderstood the unjust enrichment doctrine and, as such, have improperly presented back-door attempts at claims rooted in breach of contract. Unjust enrichment is reserved as an equitable doctrine, not designed as a substitute for a failed tort claim.[1] To that end, all money damages that are subject to the parties' Third Stock Sale Agreement are not recoverable under the theory of unjust enrichment, including any reimbursements found to be covered by the Ducas [Incremental] Payoff (unreimbursed amounts expended for the development of [the] Pinecrest subdivision and hotel site, not to exceed … $191,093.63[]).

> [1] *See Sevast v. Kakouras*, …. 915 A.2d 1147, 1153 n.7 ([Pa.] 2007) ("An action based on unjust enrichment is action which sounds in quasi-contract or contract implied in law."); *see also Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. 2008) ("A quasi-contract imposes duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another[.]").

Given the allegations presented to this court, the only two seemingly viable unjust enrichment claims available to [Appellants] are recovery for [PDC's] operational expenses allegedly paid by [Ducas] to third party, Pinecrest Lake Companies, and the alleged loan Ducas provided directly to [PDC] or to contractors working toward [PDC's] alleged benefit, not otherwise covered by the terms of the Third Stock Sale Agreement[,] as there was inadequate evidence presented to show that the monies provided were expended for the development of [the] Pinecrest subdivision and hotel site.

[Appellants] bear the burden of proving by a preponderance of the evidence each element of their unjust enrichment claim, including: (1) benefits were conferred on one party by another; (2) such benefits were appreciated by the recipient; and (3) benefits were accepted and retained under such circumstances that it would be inequitable for the recipient to do so without payment of their value. *Discover Bank v. Stucka*, … 33 A.3d 82 [Pa. Super.] 2011). [Appellants] have failed their burden as to both possible claims for distinctly different reasons. Regarding

[Appellants'] first claim, they argue that operational monies expended on behalf of [PDC] were funneled through a separate and distinct company, Pinecrest Lake Companies. However, they have presented no credible evidence to demonstrate that any of the monies given in the form of checks payable to Pinecrest Lake Companies were ever conferred upon [PDC], either directly or indirectly. Regarding [Appellants'] second claim, we found in our prior opinion any monies expended by [Appellants] were the result of an investment intended for the personal benefit of … Ducas. While [PDC] may have been a passive third[-]party beneficiary, it was not inequitable or unjust for [PDC] to retain such benefits without payment of their value. Therefore, and for the following reasons[,] we find [Appellants] are not entitled to recover under the theory of unjust enrichment.

Concerning [Appellants'] claim to alleged operational expenses, [their] sole evidence that the checks paid to Pinecrest Lake Companies conferred any benefit to [PDC] rests in the testimony of … Ducas. "In a non[-]jury trial, the trial court is the finder of fact and the sole judge of credibility." *Costa v. City of Allentown*, 153 A.3d 1159, 1168 (Pa. C[mwlth]. 2017) (citing *In re Funds in the Possession of Conemaugh Twp. Supervisors*, … 753 A.2d 788, 790 ([Pa.] 2000)). The trial court is free to reject even uncontradicted testimony, should they find it is lacking credibility. *Id.* (citing *D'Emilio v. Bd. of Supervisors, Twp. of Bensalem*, … 628 A.2d 1230, 1233 ([Pa. Cmwlth.] 1993)). As indicated in our December 30, 2019 opinion, we find the testimony of … Ducas lacks all credibility. As such, [Appellants] presented no credible evidence supporting a link between Pinecrest Lake Companies and [PDC], indicating that they were operating as one in the same entity. Likewise, [Appellants] presented no credible evidence that any money received by Pinecrest Lake Companies was ever used to benefit [PDC].

As such, [Appellants] have failed their burden to establish by a preponderance of the evidence the first element necessary for their unjust enrichment claim. Therefore, we find, based on the credibility of the testimony and evidence presented before us that … [Appellants] cannot recover the alleged money damages for the checks paid to Pinecrest Lake Companies amounting to … $151,070.00[].

Next[,] we examine [Appellants'] second possible unjust enrichment claim, recovery for damages amounting to …

- 23 -

$260,324.63[]—the difference between the second lump sum damages from [Appellants'] complaint [($411,394.63)] and the aggregate total paid to Pinecrest Lake Companies [($151,070.00)]. For the reasons articulated in our December 30, 2019 opinion, we find that the monies expended by [Appellants] through checks payable to [PDC] or to contractors for the alleged benefit of [PDC], do not fall under the terms of the Third Stock [Sale] Agreement, as they fall outside the scope of monies expended for the "development of Pinecrest subdivision and hotel site."[14]   Similarly, as we found in our previous opinion and explain in more detail in our breach of contract analysis…, such expenditures by [Appellants] are not covered under the parties' Termination [of Final] Agreement. Accordingly, it is appropriate for [Appellants] to attempt recovery through an unjust enrichment action. However, for the reasons below, [Appellants] are unable to meet their burden.

Given the testimony and evidence of the checks presented to this court, we find that [Appellants] conferred a benefit on [PDC]. However, the primary question surrounding a claim for unjust enrichment remains. "[T]he most significant element of the doctrine is whether the enrichment of the defendant is *unjust*. The doctrine does not apply simply because the defendant may have been benefited as a result of the actions of the plaintiff." ***Braun v. Wal-Mart Stores, Inc.***, … 24 A.3d 875, 896 ([Pa. Super.] 2011), *aff'd* … 106 A.3d 656 ([Pa.] 2014) (quoting ***Styer v. Hugo***, … 619 A.2d 347, 350 ([Pa. Super.] 1993)[(emphasis in original)]). "Whether the doctrine applies depends on the unique factual circumstances of each case…." ***Discover Bank***, 33 A.3d … at 88 (quoting ***Stoeckinger***, 948 A.2d … at 833). Looking at the factual circumstances surrounding this matter, … Ducas' actions were self-serving, unauthorized transactions amounting to a failed investment. As such, we do not find that the enrichment of [PDC] was unjust.

The facts of the instant matter are unique[] and require an assessment of the totality of the circumstances…. Ducas was in

---

[14] ***See*** TCO I at 13-14 (noting that the unauthorized nature of the transactions Ducas undertook while acting as president of PDC, without authority to do so, coupled with contractual evidence that Ducas was pursuing such risk personally, reveals to the court that the expenses related to the franchise agreement with Hawthorn Suites Golf Resort and Westminster fell outside the parties' reimbursement clause in the Third Stock Sale Agreement).

the process of attempting a series of private stock sales with [PDC's] primary shareholder, … Carroll, to purchase the controlling shares of [PDC]. While the sale was still pending, … Carroll, president of [PDC], went to jail and Ducas assumed control of [PDC] without any authorization. As an unauthorized corporate officer, Ducas proceeded to make unauthorized expenditures using his personal funds to benefit his own investment interest[s] in [PDC]. To that end, Ducas engaged in activities, such as expending money developing [PDC's] land into an appropriate site for a franchise opportunity with Hawthorn Suites Gold Resort. He then proceeded to list his sister as owner of the franchise, instead of [PDC]. Under such circumstances, it is clear to this court that although [PDC] may have received some ancillary benefit from [Appellants'] actions, the retention of such benefit without compensation to [Appellants] is not unjust.

[Appellants] have failed their burden to establish by a preponderance of the evidence the third and final element necessary for their unjust enrichment claim. Therefore, we find based on the credibility of the testimony and evidence presented before us in this action, [Appellants] cannot recover the alleged money damages amounting to … $260,324.63[].

TCO II at 6-11 (unnecessary capitalization and citations to record omitted).

After careful review, we discern no abuse of discretion or error of law.

Accordingly, we affirm the judgment entered on June 12, 2020, in favor of PDC and against Appellants.

Judgment affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/6/21</u>